JASON MAIER, ESQ.
Nevada Bar No. 8557
JOSEPH A. GUTIERREZ, ESQ.
Nevada Bar No. 9046
DANIELLE J. BARRAZA, ESQ.
Nevada Bar No. 13822
**MAIER GUTIERREZ & ASSOCIATES**
8816 Spanish Ridge Avenue
Las Vegas, Nevada 89148
Telephone:  702.629.7900
Facsimile:   702.629.7925
Email:       jrm@mgalaw.com
             jag@mgalaw.com
             djb@mgalaw.com

CRAIG J. ACKERMANN, ESQ.
California Bar No. 229832
**ACKERMANN & TILAJEF, P.C.**
1180 South Beverly Drive, Suite 610
Los Angeles, California 90035
Telephone:  310.277.0614
Facsimile:   310.277.0635
Email:       cja@ackermanntilajef.com
(pro hac vice motion forthcoming,
will comply with LR IA 11-12 within 14 days)

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| REGINALD COLEMAN, an individual; DARNELL COLEMAN, an individual; BAYRON MARSHALL, an individual; JAYLIN MARSHALL, an individual; BARY MARSHALL, an individual; KAVON MARSHALL, an individual; THOMAS JONES, an individual; ALBERTO AVALOS, JR., an individual; RODERICK ANDREWS, an individual; BRANDON GARNETT, an individual; WESLEY LEDBETTER, an individual; ERICA COSEY, an individual; and RAFAEL BROWN, an individual, | **PLAINTIFFS' COMPLAINT FOR:** 1. **RACIAL HARASSMENT IN VIOLATION OF 42 USC § 1981; AND** 2. **RETALIATORY TERMINATION IN VIOLATION OF 42 USC § 1981; AND** |
| *Plaintiffs,* | |
| v. | **PLAINTIFFS' DEMAND FOR JURY TRIAL** |
| CARDINAL PAINT AND POWDER, INC., a domestic corporation; and DOES I through X; and ROE CORPORATIONS I through X, inclusive, | |
| *Defendants.* | |

- 1 -

Plaintiffs REGINALD COLEMAN, DARNELL COLEMAN, BAYRON MARSHALL, JAYLIN MARSHALL, BARY MARSHALL, KAVON MARSHALL, THOMAS JONES, ALBERTO AVALOS, JR., RODERICK ANDREWS, BRANDON GARNETT, WESLEY LEDBETTER, ERICA COSEY, and RAFAEL BROWN (collectively "Plaintiffs"), hereby submit an Original Complaint ("Complaint") against CARDINAL PAINT AND POWDER, INC. ("Defendant" or "Cardinal Paint"), and respectfully allege as follows:

## I.   <u>NATURE OF ACTION</u>

1.      Plaintiffs were employed by Cardinal Paint at its facility located at 1900 Aerojet Way, North Las Vegas, NV 89030.  During their employment, reminiscent of the bygone "Jim Crow" era, Defendant subjected Plaintiffs, on a daily basis, to a vile racially hostile work environment in which their manager, Craig Fick, called them the "n" word repeatedly; called Hispanic workers "spics" and "wetbacks"; made racist and homophobic jokes to them and in their presence; brought them, but not other employees, fried chicken, based on racial stereotypes; and otherwise created and fostered a racially hostile work environment that was extremely offensive to African American and Hispanic employees, all in violation of 42 U.S.C Section 1981 ("Section 1981").

2.      Defendant knew or should have known about the routine extreme racial harassment because it was open and notorious, and because Plaintiffs complained, on dozens of occasions, about Mr. Fick's use of racist slurs in the workplace to Defendant's upper management officials and to its Human Resources ("HR") department, all of whom did nothing to discipline Mr. Fick or otherwise stop his egregious and sickening racist slurs.  Defendant did not implement prompt or effective remedial action against Mr. Fick's highly offensive and racist workplace misconduct.  As a result, Plaintiffs suffered anguish and humiliation from this racist abuse for an extensive period of time.

## II.   <u>VENUE</u>

3.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1392(b) because Defendant conducted business in North Las Vegas, in this district, and because all or a substantial part of the events giving rise to the claims stated herein occurred in this district at Defendant's facility located at 1900 Aerojet Way, in North Las Vegas, NV 89030.

### III.   JURISDICTION

4.      This Court has subject matter jurisdiction over the Plaintiffs' federal claims pursuant to 42 U.S.C. §1981 (a)–(b), 42 U.S.C. §1988(a)–(b), 29 U.S.C. § 2617(a)(2) and 28 U.S.C. §1331. Plaintiffs will amend their Complaint to add racially hostile work environment and retaliation claims under Title VII of the Civil Rights Act of 1964 and under NRS 613.330 and NRS 613.340 once they receive federal right to sue letters from the EEOC, where Charges are pending for a number of the named Plaintiffs, and those claims will mirror the Section 1981 claims.

### IV.   PARTIES

5.      Plaintiff Reginald Coleman, who at all relevant times has resided in the State of Nevada, is a former employee of Defendant. Plaintiff Reginald Coleman was employed by Defendant as an Extruder Operator and then as the Lead of the Express Department from in or around August 2018 until on or around July 19, 2022.

6.      Plaintiff Darnell Coleman, who at all relevant times has resided in the State of Nevada, is a former employee of Defendant.  Plaintiff Darnell Coleman was employed by Defendant as a Mill Operator and Extruder Operator from in or around July 2020 until in or around July 19, 2022.

7.      Plaintiff Bayron Marshall, who at all relevant times has resided in the State of Nevada, is a current employee of Defendant.  Since in or around May 2021 through the present, Plaintiff Bayron Marshall has been employed by Defendant as a Mill Operator, then as an Extruder Operator, and currently as the Lead of the Express Department.

8.      Plaintiff Jaylin Marshall, who at all relevant times has resided in the State of Nevada, is a current employee of Defendant. Plaintiff Jaylin Marshall was employed by Defendant from on or around July 14, 2021 through on or around August 26, 2021 as a Mill Operator, and then from on or around October 28, 2021 through the present as a Mill Operator and then as an Extruder Operator.

9.      Plaintiff Bary Marshall, who at all relevant times has resided in the State of Nevada, is a former employee of Defendant. Plaintiff Bary Marshall was employed by Defendant as a Mill Operator, then as an Extruder Operator from in or around September 2020 until in or around May 2022.

10.     Plaintiff Kavon Marshall, who at all relevant times has resided in the State of Nevada, is a current employee of Defendant.  Since on or around March 14, 2021 through the present, Plaintiff

Kavon Marshall has been employed by Defendant as a Mill Operator, first in the Production Department and from in or around September 2022, in the Express Department.

11.     Plaintiff Thomas Jones, who at all relevant times has resided in the State of Nevada, is a former employee of Defendant.  Plaintiff Thomas Jones was employed by Defendant as a Mill Operator from in or around March 2019 until on or around August 5, 2019.

12.     Plaintiff Alberto Avalos, Jr., who at all relevant times has resided in the State of Nevada, is a former employee of Defendant. From in or around January 2007 to November 2017, Plaintiff Alberto Avalos, Jr. worked as a Lab Technician and later as a Master Tinter at Cardinal Paint's El Monte facility, located at 1329 Potrero Ave., South El Monte, California 91733.  From in or around November 2017 until in or around August 2019, Plaintiff Alberto Avalos, Jr. worked as the Quality Control Supervisor of the Express Department at its Las Vegas facility.

13.     Plaintiff Roderick Andrews, who at all relevant times has resided in the State of Nevada, is a former employee of Defendant. Plaintiff Roderick Andrews was employed by Defendant as a Mill Operator from in or around January 2021 until in or around September 2021.

14.     Plaintiff Brandon Garnett, who at all relevant times has resided in the State of Nevada, is a former employee of Defendant. Plaintiff Brandon Garnett was employed by Defendant as a Mill Operator and later as an Extruder Operator from in or around October 2020 through in or around January 2021 and again from in or around October 2021 until on or around January 21, 2022.

15.     Plaintiff Wesley Ledbetter, who at all relevant times has resided in the State of Nevada, is a former employee of Defendant. Plaintiff Wesley Ledbetter was employed by Defendant as a Mill Operator and later as a Machine Operator from on or around July 5, 2021 until on or around August 15, 2022.

16.     Plaintiff Erica Cosey, who at all relevant times has resided in the State of Nevada, is a former employee of Defendant. Plaintiff Erica Cosey was employed by Defendant as a Janitor from on or around August 24, 2018 until on or around August 24, 2019.

17.     Plaintiff Rafael Brown, who at all relevant times has resided in the State of Nevada, is a former employee of Defendant. Plaintiff Rafael Brown was employed by Defendant as a Mill Operator and as an Extruder Operator from in or around April 2021 until in or around April 2022.

18.     Upon information and belief, Defendant Cardinal Paint is a domestic corporation registered to do business within the State of Nevada.  Cardinal Paint is engaged in, among other things, the business of manufacturing paint related products.  According to its website, Cardinal Paint specializes in industrial coatings.  Upon information and belief, Cardinal Paint employs over 450 employees across all of its locations, and it generates approximately $70 million in revenue each year.

19.     Defendant's registered agent for service of process in Nevada is Steven A. Silverstein, located at 2747 Paradise Rd., #505, Las Vegas, Nevada, 89109.

20.     The true names and capacities, whether individual, corporate, associate, partnership or otherwise, of the defendants herein designated as DOES I through X and ROE CORPORATIONS I through X, inclusive, are unknown to Plaintiffs, who therefore sue said defendants by such fictitious names.  Plaintiffs will seek leave of the Court to insert the true names and capacities of such defendants when the same have been ascertained and will seek leave to join said defendants in these proceedings.

## V.     STATEMENT OF FACTS

21.     Plaintiffs hereby incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

### A.  Facts Relating to Plaintiff Reginald Coleman's Claims

22.     Plaintiff Reginald Coleman's EEOC/NERC Charge and attached Rider, which include more detailed descriptions of the preceding and following facts, are attached hereto as **Exhibit 1** and incorporated by reference as though fully set forth herein.

23.     From in or around August 2018 until on or around July 19, 2022, Plaintiff Reginald Coleman, an African-American male, was employed by Defendant at its facility in Northern Las Vegas.

24.     During Plaintiff Reginald Coleman's employment, beginning in July 2019, he was subjected to a racially hostile work environment by his employer, with no real attempt by his employer to adequately correct the situation, even though Cardinal Paint was well aware of the daily open and notorious racial harassment that Plaintiff Reginald Coleman and other African-American workers experienced at work.

25.     For example, in or around July 2019, Craig Fick ("Mr. Fick"), a Caucasian man and Plaintiff Reginald Coleman's supervisor, said to Plaintiff Thomas Jones, in Plaintiff Reginald

Coleman's presence, "What's up, my nigger?"

26.     Plaintiff Reginald Coleman spoke with Mr. Fick directly about how he should not use the "n" word around Cardinal Paint employees, to which Mr. Fick responded, "okay."  Around the same time (July 2019), Plaintiff Reginald Coleman also complained to the President of Cardinal Paint, John (nicknamed "Johnny" or "Jonny") Mitchinson ("Mr. Mitchinson"), for the first time regarding Mr. Fick's workplace use of the "n" word.  No investigation was conducted, and nothing was done in response.

27.     As a result, Mr. Fick's racist comments continued.  For example, in or around August 2019, again in the presence of Plaintiff Reginald Coleman, Mr. Fick told Plaintiff Thomas Jones, "Nigger, you don't want to fuck with me."

28.     Additional complaints by Plaintiff Reginald Coleman followed, which were made to Marcella (last name unknown) in Cardinal Paint's HR Department, and again to Mr. Mitchinson.

29.     Unfortunately, no investigations were conducted, no discipline was imposed, and Mr. Fick again continued using the "n" word and making racist comments and jokes at work despite Plaintiff Reginald Coleman's repeated discussions with him about his inappropriate use of the "n" word.

30.     In or around January 2021, Plaintiff Reginald Coleman heard about Mr. Fick using the "n" word again at work; specifically, Mr. Fick impliedly referred to himself as the "n" word while sitting next to Plaintiff Darnell Coleman at lunch because, as Mr. Fick stated to Plaintiff Darnell Coleman, "I was raised around black guys and the black guys say I got white boy skin, but I'm a … underneath" – overtly pausing in the middle of the statement for the listener to fill in the blank.

31.     Plaintiff Reginald Coleman again spoke with Mr. Fick about his use of the "n" word, and then again complained to Mr. Mitchinson about Mr. Fick's continued use of the "n" word and how it was decreasing the morale in the workplace.

32.     Also in or around January 2021, Plaintiff Darnell Coleman again spoke with Plaintiff Reginald Coleman regarding racist jokes Mr. Fick recited from comedian Kat Williams' comedy special, including by stating, "Man, Kat Williams say 'you can't smoke weed with niggers because niggers is stupid.'"  In or around February 2021, Mr. Fick also repeated a story about Dave Chappelle

and his use of the "n" word from a scene in the movie, *Blue Streak*. This triggered Plaintiff Reginald Coleman's fourth racial harassment complaint, this time again to President Mr. Mitchinson.

33.   Again, no investigations were conducted, no discipline was imposed, and Mr. Fick continued using the "n" word and making racist jokes at work.

34.   In or around September 2021, after targeting African American Cardinal Paint employee Plaintiff Roderick Andrews, by ordering him around and giving him misleading instructions, Plaintiff Roderick Andrews quit Cardinal Paint, at which point Mr. Fick referred to him as a "motherfucker" and a "nigger." Plaintiff Bary Marshall, another African American Cardinal Paint employee, promptly told Plaintiff Reginald Coleman that Mr. Fick's use of the "n" word to describe Plaintiff Roderick Andrews was extremely offensive to him.

35.   In or around February 2022, Mr. Fick said, while walking by a small group of African American employees, including Plaintiff Reginald Coleman, Plaintiff Darnell Coleman, Plaintiff Bary Marshall, and Plaintiff Jaylin Marshall, "You niggas is crazy!"

36.   Mr. Fick also called Plaintiff Brandon Garnett the "n" word around that time. Plaintiff Reginald Coleman then found out from Mr. Fick that President John Mitchinson and his brother, Daniel Mitchinson, the Director of Human Resources, were going to fire Plaintiff Brandon Garnett, even though Mr. Fick was the one who called Plaintiff Brandon Garnett the "n" word.

37.   In or around early 2022, despite Plaintiff Reginald Coleman's requests for other types of food, Mr. Fick began buying fried chicken for Defendant's African American employees, including Plaintiff Reginald Coleman, for lunch at work, and he made stereotypical, racist comments when delivering the chicken, including "all blacks like chicken," and "the best way to keep your crew going is to buy them some chicken."

38.   Once again, Plaintiff Reginald Coleman complained to President Mr. Mitchinson and Marcella from HR about Mr. Fick's fried chicken comments, to no avail.

39.   Moreover, throughout Plaintiff Reginald Coleman's employment with Cardinal Paint, he observed Mr. Fick instruct new employees not to associate with other African American employees. For example, one of the Caucasian employees at Cardinal Paint told Plaintiff Reginald Coleman that Mr. Fick told him not to associate with "certain people."

40.     In or around March or April 2022, after Cardinal Paint, through Caucasian supervisor Chris Ingram ("Mr. Ingram") asked African American employees to use porta-potties, while still allowing other employees to use restrooms, Plaintiff Reginald Coleman sent a text to Cardinal Paint President Mr. Mitchinson and his brother, in which he complained that Cardinal Paint, through Mr. Ingram, was treating African American employees like the company was "a plantation" or like the employees were a "chain gang," and that he felt extremely disrespected.

41.     In the presence of Plaintiff Reginald Coleman, after Hispanic employee, Plaintiff Alberto Avalos, Jr. quit, Mr. Fick said, "we did not need that Mexican anyway," and added, "we ain't going to hire no Mexicans."  Through Plaintiff Reginald Coleman's employment with Cardinal Paint, Mr. Fick continued making jokes about people of Mexican descent in Plaintiff Reginald Coleman's presence, including by referring to them as "wetbacks," "beaners," and "boarder rats."

42.     Plaintiff Reginald Coleman is aware that in or around March or April of 2022, Plaintiff Jaylin Marshall made a written complaint to HR regarding racial and sexual workplace harassment by Mr. Fick.  Shortly thereafter, Cardinal Paint issued Jaylin Marshall a write-up in April 2022.  Pursuant to company policy, Plaintiff Reginald Marshall was supposed to be in attendance during the meetings concerning the write-ups in the Express Department. However, Mr. Fick did not include Plaintiff Reginald Coleman in the meeting with Plaintiff Jaylin Marshall, and Plaintiff Jaylin Marshall was given a pretextual write-up. Mr. Fick stopped including Plaintiff Reginald Coleman in any meetings regarding write-ups from then on.

43.     In or around July 2022, four African American Cardinal Paint employees made another written complaint to HR about racial harassment by Mr. Fick.

44.     Marcella from HR met with Mr. Fick, but it seemed, again, that nothing significant would be done about Mr. Fick's racist behavior.  As a result, in or around July 19, 2022, Plaintiffs Reginald Coleman and Darnell Coleman resigned in protest.

45.     To Plaintiff Reginald Coleman's knowledge, Cardinal Paint has no policies to train employees about racial harassment or retaliation.  Plaintiff Reginald Coleman never received anti-racial harassment training during his employment with Cardinal Paint.

46.     The racial harassment was open and notorious, and occurred out in the open, in front of management, including Chris Ingram, and Marcella from HR. Despite having observed the racially hostile environment experienced by Plaintiff Reginald Coleman and other African-American workers, Plaintiff Reginald Coleman's supervisors did not stop it. Nor did Defendant's management, including President Jonny Mitchinson, take any corrective action.

**B.   Facts Relating to Plaintiff Darnell Coleman's Claims**

47.     Plaintiff Darnell Coleman's EEOC/NERC Charge and attached Rider, which include more detailed descriptions of the preceding and following facts, are attached hereto as **Exhibit 2** and incorporated by reference as though fully set forth herein.

48.     From on or around July 2020 through July 19, 2022, Plaintiff Darnell Coleman, an African-American male, was employed by Defendant at its facility in Northern Las Vegas.

49.     During Plaintiff Darnell Coleman's employment, he was subjected to a racially hostile work environment by his employer, with no real attempt by his employer to adequately correct the situation, even though Cardinal Paint was well aware of the daily open and notorious racial harassment that Plaintiff Darnell Coleman and other African-American workers experienced at work.

50.     For example, in or around January 2021, Plaintiff Darnell Coleman was in the breakroom for lunch eating alongside Mr. Fick, when Mr. Fick said to him, "I was raised in Texas. I was raised around black guys and the black guys say I got white boy skin, but I'm a … underneath." By pausing mid-sentence, it was immediately clear to Plaintiff Darnell Coleman that Mr. Fick was insinuating using the "n" word."   Plaintiff Darnell Coleman immediately reported the incident to Plaintiff Reginald Coleman and informed him that Plaintiff Darnell Coleman was extremely offended by Mr. Fick's implied use of the "n" word in his presence.

51.     Around the same time and in the presence of Plaintiff Darnell Coleman, Mr. Fick also recited a racist joke from Kat Williams' comedy special, stating, "Man, Kat Williams say 'you can't smoke weed with niggers because niggers is stupid.'"

52.     Further, around the same time (January 2021), when Plaintiff Darnell Coleman was working with his African American coworkers, Plaintiffs Bary Marshall and Brandon Garnett, Mr. Fick stated, "Yeah, them niggers…" and walked away.  Plaintiff Darnell Coleman was in disbelief.

53.     In or around February 2021, Mr. Fick approached Plaintiff Darnell Coleman and Plaintiff Bary Marshall and quoted a line by Dave Chappelle in the movie, *Blue Streak*.  Specifically, Mr. Fick pointed his hands as if he were holding a gun and said, "I'm going to be like Dave Chappelle in the movie with Martin Lawrence and be like, back up nigger, back up."  Plaintiff Darnell Coleman reported this incident to Plaintiff Reginald Coleman.

54.     Mr. Fick's use of racist slurs continued throughout 2021.

55.     In or around December 2021, Mr. Fick said to Plaintiff Darnell Coleman and Plaintiff Bayron Marshall, "you niggas is crazy!"  Plaintiff Darnell Coleman also found out from a coworker that Mr. Fick had also referred to Mexicans as "wetbacks" and "beaners."  And on one occasion, Plaintiff Darnell Coleman heard Mr. Fick refer to Marcella from HR as a "backstabbing bean-eating bitch. That's what Mexicans do."

56.     Also in or around December 2021, in addition to the verbal complaints he made to Plaintiff Reginald Coleman, Plaintiff Darnell Coleman complained to Eli (last name unknown), a Production Supervisor, about Mr. Fick's workplace racial harassment, to no avail.  No investigation was done, no discipline was imposed, and Mr. Fick's racial harassment did not stop.  The only thing that happened was that Cardinal Paint apparently sent Mr. Fick to attend sensitivity training, which was ineffectual.

57.     Mr. Fick's workplace racial harassment continued on an almost daily basis throughout the rest of Plaintiff Darnell Coleman's time at Cardinal Paint.

58.     For example, Mr. Fick offered African American employees, including Plaintiff Darnell Coleman, fried chicken for lunch, despite Plaintiff Reginald Coleman's repeated requests for different types of food.

59.     In or around February 2022, Mr. Fick once again said to a group of African American employees, including Plaintiffs Darnell Coleman, Reginald Coleman, Bayron Marshall, Bary Marshall, and Jaylin Marshall, "You niggas is crazy!"

60.     On or around July 15, 2022, Plaintiff Darnell Coleman and five other Cardinal Paint employees, including Plaintiffs Bayron Marshall and Jaylin Marshall, filed grievances with HR against Mr. Fick for his racially inappropriate and unwelcome comments.

61.     The next day, July 16, 2022, Plaintiffs Darnell Coleman and Reginald Coleman were issued bogus write-ups by Mr. Ingram even though the Plaintiffs knew the real reason they were being written up was because they filed grievances regarding Mr. Fick's repeated racial harassment.

62.     On the morning of July 19, 2022, because Cardinal Paint had failed to take any corrective action by removing Mr. Fick from the Express Department and/or demoting him from his supervisory role, and due to the extreme stress, anxiety, and panic Plaintiff Darnell Coleman felt when simply thinking about being in Mr. Fick's presence, Plaintiff Darnell Coleman resigned.

63.     To Plaintiff Darnell Coleman's knowledge, Cardinal Paint has no policies to train employees about racial harassment or retaliation.  Plaintiff Darnell Coleman never received anti-racial harassment training during his employment with Cardinal Paint.

64.     The racial harassment was open and notorious, and occurred out in the open, in front of management, including Chris Ingram, and Marcella from HR.  Despite having observed the racially hostile environment experienced by Plaintiff Darnell Coleman and other African-American workers, Plaintiff Darnell Coleman's supervisors did not stop it. Nor did Defendant's management take any corrective action.

**C. Facts Relating to Plaintiff Bayron Marshall's Claims**

65.     Plaintiff Bayron Marshall's EEOC/NERC Charge and attached Rider, which include more detailed descriptions of the preceding and following facts, are attached hereto as **Exhibit 3** and incorporated by reference as though fully set forth herein.

66.     From on or around May 2021 through the present, Plaintiff Bayron Marshall, an African-American male, has been employed by Defendant at its facility in Northern Las Vegas.

67.     During Plaintiff Bayron Marshall's employment, he was subjected to a racially hostile work environment by his employer, with no real attempt by his employer to adequately correct the situation, even though Cardinal Paint was well aware of the daily open and notorious racial harassment that Plaintiff Bayron Marshall and other African-American workers experienced at work.

68.     On one such occasion, in or around July 2021, in reference to African American employee Plaintiff Roderick Andrews, Mr. Fick said to Plaintiff Bayron Marshall, "I am going to get that nigger."  Plaintiff Bayron Marshall did not respond and walked away.

69.     Starting in or around July 2021, Mr. Fick also offered African American employees, but no other groups, fried chicken for lunch, stating, "I know what you want. Let me guess – fried chicken?"  Mr. Fick made these types of comments numerous times.  When Plaintiff Bayron Marshall asked Mr. Fick what he meant by his comments, Mr. Fick replied, "just guessing," and acted like he did not understand the racial innuendo in his comments.

70.     In or around December 2021, Plaintiff Bayron Marshall filled out paperwork to apply for a loan through Cardinal Paint, which offers employees loans once they submit the paperwork to HR.  Plaintiff Bayron Marshall gave Mr. Fick his paperwork to submit it to HR, but Mr. Fick did not want to turn his paperwork into HR and instead told Plaintiff Bayron Marshall not to "be like certain team members."  When Mr. Fick listed off names of those team members, Plaintiff Bayron Marshall noticed that each name was that of an African American employee, such as Plaintiffs Reginald Coleman and Darnell Coleman.  Further, Mr. Fick told Plaintiff Bayron Marshall the amount of the loans the other African American employees were applying for, along with his thoughts about why they were applying for those loans.  For example, Mr. Fick told Plaintiff Bayron Marshall that he thought Plaintiff Darnell Coleman was going to gamble with the loan money.  Mr. Fick then told Plaintiff Bayron Marshall that he would only submit his loan paperwork to HR if he worked overtime and came into work on a few Saturdays.

71.     Mr. Fick also routinely made anti-Hispanic, anti-gay, and misogynistic comments in the presence of Plaintiff Bayron Marshall.  For example, Mr. Fick told Plaintiff Bayron Marshall and other coworkers that he "does not like when Spanish people speak Spanish at work," and also referred to Hispanic people as "wetbacks."

72.     Throughout his employment at Cardinal Paint, Plaintiff Bayron Marshall also noticed that Mr. Fick would consistently approve time-off requests for non-African-American employees without question or any issues, but he would not do the same for African-American employees, including for Plaintiff Bayron Marshall.

73.     On or around April 30, 2022, Bayron Marshall verbally complained about Mr. Fick's harassment of minorities to Marcella in HR.  Plaintiff Bayron Marshall's brother, Plaintiff Jaylin Marshall, also complained about racial harassment by Mr. Fick in or around March and April, 2022, to

no avail.  Plaintiff Bayron Marshall was worried that if he filed a written complaint about Mr. Fick to HR, he would face retaliation, like his brother was facing (discussed below), so he waited to file one until he knew how Cardinal Paint would respond to Plaintiff Jaylin Marshall's complaints.

74.     When no action was taken in response to Plaintiff Bayron Marshall's verbal complaints and others' complaints, on or around July 15, 2022, Plaintiff Bayron Marshall complained again, this time in writing, to HR, regarding Mr. Fick and the racially hostile work environment he created.  This complaint was submitted at the same time four other Cardinal Paint employees, including Plaintiffs Reginald Coleman and Darnell Coleman, along with employees Simeon McCree ("Mr. McCree") and Corey Lowrey ("Mr. Lowrey"), submitted their own complaints.

75.     On or around July 19, 2022, Cardinal Paint President Jonny Mitchinson approached Plaintiff Bayron Marshall and his brother, Plaintiff Jaylin Marshall, and asked them whether a promotion and raise of $1.50 per hour would be adequate to compensate them for the racially hostile work environment they were subjected to by Mr. Fick.  In other words, Mr. Mitchinson was offering Plaintiffs Darnell and Reginald Coleman's positions to Plaintiffs Bayron and Jaylin Marshall rather than disciplining or otherwise dealing with Mr. Fick's racial harassment of the employees.  In response, Baryon Marshall and Jaylin Marshall made it clear to Mr. Mitchinson that they had no intention of resolving their racial harassment claims in exchange for a promotion and a small raise.  To be clear, no settlement paperwork or release of claims was ever actually proposed or agreed to.

76.     To Plaintiff Bayron Marshall's knowledge, Cardinal Paint has no policies to train employees about racial harassment or retaliation.  Plaintiff Bayron Marshall never received anti-racial harassment training during his employment with Cardinal Paint.

77.     On or around August 13, 2022, Cardinal Paint implemented (apparently for the first time) some form of racial harassment training for Mr. Fick, who informed Plaintiff Bayron Marshall about the same.  Mr. Fick also told Plaintiff Bayron Marshall that he did not believe he needed to complete the racial harassment training because he was already trained in the military and stated, "you cannot be racist if you were in the military."

78.     The racial harassment was open and notorious, and occurred out in the open, in front of management, including Plaintiff Reginald Coleman, and Marcella from HR.  Despite having observed

the racially hostile environment experienced by Plaintiff Bayron Marshall and other African-American workers, none of Plaintiff Bayron Marshall's supervisors, with the exception of Plaintiff Reginald Coleman, did anything to stop it. Nor did Defendant's management take any corrective action or undertake any actual investigation.

**D. Facts Relating to Plaintiff Jaylin Marshall's Claims**

79.     Plaintiff Jaylin Marshall's EEOC/NERC Charge and attached Rider, which include more detailed descriptions of the preceding and following facts, are attached hereto as **Exhibit 4** and incorporated by reference as though fully set forth herein.

80.     From on or around July 14, 2021 through August 26, 2021, and again from October 28, 2021 through the present, Plaintiff Jaylin Marshall, an African-American male, was employed by Defendant at its facility in Northern Las Vegas.

81.     Beginning in or around July 2021, Plaintiff Jaylin Marshall's supervisor, Eli (last name unknown), who is a Hispanic male, and beginning in or around November 2021, Plaintiff Jaylin Marshall's coworker, Mr. Fick, a white male, subjected Plaintiff Jaylin Marshall and other employees to a racially hostile environment, with no real attempt by his employer to adequately correct the situation, even though Cardinal Paint was well aware of the daily open and notorious racial harassment that Plaintiff Jaylin Marshall and other African-American workers experienced at work.

82.     For example, on or around August 26, 2021, Plaintiff Jaylin Marshall quit working at Cardinal Paint due to the racially hostile work environment created by his supervisor in the Production Department, Eli.  Specifically, immediately after Plaintiff Jaylin Marshall trained a new employee named Arizona (last name unknown), Arizona was promoted to a higher sought-after position than Plaintiff Jaylin Marshall and was given a raise, which resulted in a significantly higher salary for Arizona than what Plaintiff Jaylin Marshall was being paid.

83.     In or around October 28, 2021, after he resumed working for Cardinal Paint, Plaintiff Jaylin Marshall was transferred to the Express Department, per his request, to escape his former supervisor's (Eli) racial harassment.  Nevertheless, beginning on or around November 18, 2021, Mr. Fick, who supervised the Express Department, subjected Plaintiff Jaylin Marshall to racial harassment

on a daily basis by using racially derogatory terms when referring to minority Cardinal Paint employees.

84.     For instance, Mr. Fick referred to African American employees, including Plaintiff Jaylin Marshall, as "niggers" and "monkeys," and to Mexican and Hispanic employees as "wetbacks." And, in Plaintiff Jaylin Marshall's presence, Mr. Fick repeatedly made racially hostile gestures and racially inappropriate remarks about his Asian coworker, Mr. Drusendahl, including on one occasion where, when Mr. Drusendahl's back was to Plaintiff Jaylin Marshall, Mr. Fick pulled back the corners of his eyes with his fingers, pointed at Mr. Drusendahl, and said to Plaintiff Jaylin Marshall:  "Look at me! Look at me! I'm that guy over there! I'm that chink!"

85.     Moreover, on numerous occasions, Mr. Fick bought the African American employees at Cardinal Paint fried chicken despite requests for other types of food, and he would buy Mr. Drusendahl Panda Express, Teriyaki Madness, or China GoGo.  Mr. Fick would also take Mr. Lowrey, Plaintiff Jaylin Marshall's Caucasian coworker, with Mr. Fick to get the food, and he would buy Mr. Lowrey Five Guys or Cracker Barrel.

86.     In or around February 2022, while Plaintiff Jaylin Marshall was at a morning meeting with Plaintiff Reginald Coleman, the other supervisor of the Express Department; Plaintiff and coworker Darnell Coleman; Plaintiff Jaylin Marshall's father and brother, Plaintiffs Bary and Bayron Marshall, respectively; and Mr. Fick, Mr. Fick, while walking away, said, "You niggers is crazy!" When Mr. Fick came back later, he did not address the fact that he just called five African American employees the "n" word.

87.     On or around March 21, 2022, Mr. Fick asked Plaintiff Jaylin Marshall to pick up lunch for everyone.  After Plaintiff Jaylin Marshall brought the food back to work, Mr. Fick told him that he bought one too many burritos, cussed him out, hit the burritos off the table, and started throwing boxes and other nearby items around the workplace in a violent manner.

88.     As a result, on or around the same day (March 21, 2022), Plaintiff Jaylin Marshall made a complaint against Mr. Fick to Marcella in HR and to the Director of HR, Daniel Mitchinson, regarding Mr. Fick's violent response to Plaintiff Jaylin Marshall's extra burrito and his racially hostile comments about minority employees.  Although Plaintiff Jaylin Marshall did not hear back from Marcella about

his complaint, Daniel Mitchinson called him and told him that if only Plaintiff Jaylin Marshall was going to write up Mr. Fick for his actions, "just one person writing up my best worker don't mean nothing."

89.     After President John Mitchinson spoke with Mr. Fick about the complaint, and Mr. Fick asked Plaintiff Jaylin Marshall whether he wrote Mr. Fick up, to which Plaintiff Jaylin Marshall responded that he did, Mr. Fick told him, "Well, I got something for you" and issued Plaintiff Jaylin Marshall a pretextual write up. Mr. Fick told Plaintiff Jaylin Marshall that he issued the write up based on Plaintiff Jaylin Marshall "being away from the facility while on the clock" during the time in which Mr. Fick specifically asked Plaintiff Jaylin Marshall to pick up food for the employees. Based on the timing of Plaintiff Jaylin Marshall's complaint, the write up could only be seen as retaliation for Plaintiff Jaylin Marshall's complaint of racial harassment.

90.     On or around the same day (March 21, 2022), Mr. Fick attempted to issue Plaintiff Jaylin Marshall a second write-up. Although Cardinal Paint had a protocol requiring that another supervisor of the Express Department, Plaintiff Reginald Coleman, be in attendance for meetings regarding write-ups issues to employees in the Express Department, Mr. Fick did not include Plaintiff Reginald Coleman in the meeting to discuss the write-up against Plaintiff Jaylin Marshall.

91.     Accordingly, that same day, Plaintiff Jaylin Marshall made a verbal complaint to Marcella regarding Mr. Fick issuing write-ups against Plaintiff Jaylin Marshall in retaliation for his written racial harassment complaint. In response, Marcella informed Daniel Mitchinson of the verbal complaint, and he confirmed that Mr. Fick "[could] not write [Plaintiff Jaylin Marshall] up because it would be retaliation."

92.     On or around April 1, 2022, Plaintiff Jaylin Marshall submitted a second written complaint to Marcella and Daniel Mitchinson regarding Mr. Fick's misconduct. Plaintiff Jaylin Marshall never heard back from Marcella or Daniel regarding that complaint. However, for the following two or three weeks, Mr. Fick started overworking Plaintiff Jaylin Marshall and attempted to sabotage his work by giving him tasks to distract Plaintiff Jaylin Marshall from his machine while it was running in an attempt to give Cardinal Paint a reason to fire Plaintiff Jaylin Marshall.

93. For example, Mr. Fick made Plaintiff Jaylin Marshall drive a forklift even though he was not forklift-certified, take out everyone's trash every day, and clean everyone's machines every day.

94. On or about April 28, 2022, Plaintiff Jaylin Marshall was walking by Mr. Fick and noticed that he was texting Daniel Mitchinson about Plaintiff Jaylin Marshall and lying to Daniel Mitchinson by stating that he did not make Plaintiff Jaylin Marshall drive a forklift, take out everyone's trash, and clean everyone's machines. Plaintiff Jaylin Marshall also read that Daniel Mitchinson responded to Mr. Fick stating that he did not care what Plaintiff Jaylin Marshall had to say because he thought Plaintiff Jaylin Marshall was the one who was lying.

95. In or around mid-May 2022, Cardinal Paint co-worker Corey Lowrey informed Plaintiff Jaylin Marshall that Mr. Fick had been sharing his and other Black coworkers' private information with new employees like Mr. Lowrey, including health-related information, pay levels, and about how Plaintiff Jaylin Marshall's younger brother, Plaintiff Kavon Marshall, works harder than all other employees in the Production Department because Kavon "works with the wetbacks."

96. Plaintiff Jaylin Marshall also noticed that whenever Mr. Fick was around Mr. Lowrey, he would make racially derogatory comments more frequently, perhaps because Mr. Fick thought a Caucasian employee would appreciate those comments, including by excessively referring to African American employees as the "n" word; referring to Hispanic employees as "wetbacks" and "beaners;" and referring to Mr. Drusendahl and another Asian co-worker, Sony (last name unknown), as "chinks."

97. In or around May 2022 through August 2022, Mr. Fick also told Plaintiff Jaylin Marshall stories about the other employees at Cardinal Paint, in which he used the "n" word to describe someone that Plaintiff Darnell Coleman had told him about, and stated, "Yeah, them guys [the Hispanic employees in the Production Department] never take a break. All they know how to do is work. It's been going on since their grandma… wetbacks."

98. In or around the beginning of July 2022, Plaintiff Jaylin Marshall submitted a third written complaint to HR about Mr. Fick's misconduct. Plaintiff Jaylin Marshall never heard back from Marcella or Daniel Mitchinson about that complaint, either.

99.     On or around July 15, 2022, while five other Cardinal Paint employees submitted written complaints against Mr. Fick to HR, Plaintiff Jaylin Marshall again made a verbal complaint to Daniel Mitchinson regarding Mr. Fick's continuous racial harassment in the workplace.  In response, Daniel Mitchinson told Plaintiffs Jaylin and Bayron Marshall that they were "going to get promoted" and "not to worry about it."

100.     Plaintiff Jaylin Marshall was also aware of other complaints made by other minority employees around the same time against Mr. Fick, including a complaint Mr. Drusendahl had made before he quit due to the racially hostile work environment, along with complaints made by Taylor (last name unknown) and Taylor's direct supervisor, Jeremy (last name unknown).  Plaintiff Jaylin Marshall also overheard Mr. Fick tell Mr. Lowrey that Taylor and Jeremy never submitted their written complaints against him because they found out that Daniel Mitchinson was going to terminate Plaintiffs Reginald and Darnell Coleman for submitting written complaints against Mr. Fick.

101.     On or around July 19, 2022, Daniel Mitchinson spoke with all of the employees in the Express Department about Mr. Fick.  Specifically, Daniel Mitchinson informed Plaintiff Jaylin Marshall and other coworkers that he was going to issue write-ups to him and Plaintiffs Reginald Coleman, Darnell Coleman, Bayron Marshall, and Mr. Lowrey for "ganging up on [Mr. Fick]."  A few hours later, Plaintiffs Reginald, and Darnell Coleman resigned (were constructively discharged) due to the racially hostile work environment.

102.     Daniel Mitchinson then approached Plaintiffs Jaylin and Bayron Marshall asking, "What's going on with [Mr. Fick]?"  Plaintiff Jaylin Marshall reiterated that Mr. Fick was discussing minority employees' personal and private information with the new Caucasian employees, and that Mr. Fick was getting upset with and reprimanding only minority employees for minor mistakes.  Daniel Mitchinson then asked Plaintiffs Jaylin and Bayron Marshall whether "a promotion would be good enough," stating that he was going to give both Plaintiffs a $1.50 raise, that Bayron would be promoted to Lead Operator of the Express Department, and that Jaylin would be promoted to Extruder Operator. In other words, instead of disciplining or otherwise dealing with Mr. Fick's ongoing racial harassment, Daniel Mitchinson instead offered Plaintiffs Jaylin and Bayron Marshall the positions of now-resigned Plaintiffs Reginald and Darnell Coleman.  Plaintiff Jaylin Marshall told Daniel Mitchinson that he was

unsure of whether a promotion and raise would resolve the issue, and he never heard anything further from Daniel Mitchinson regarding his complaints of racial harassment against Mr. Fick.

103.    In or around October 2022, while Plaintiff Jaylin Marshall was working with his brothers, Bayron and Kavon Marshall, and Mr. Fick, and while Kavon discussed a tune up he wanted for his car, Mr. Fick said to Kavon, "Even poor monkeys don't go that slow."

104.    To Plaintiff Jaylin Marshall's knowledge, Cardinal Paint does not have a regular policy to train employees about racial harassment or retaliation.  Plaintiff Jaylin Marshall never received anti-racial harassment training during his employment with Cardinal Paint.

105.    The racial harassment was open and notorious, and occurred out in the open, in front of management, including Plaintiff's managers/supervisors Reginald Coleman, Eli, Daniel Mitchinson, John Mitchinson, and Marcella. Despite having observed the racially hostile environment experienced by Plaintiff Jaylin Marshall and other African-American workers, none of Plaintiff Jaylin Marshall's supervisors, with the exception of Plaintiff Reginald Coleman, did anything to stop it. Nor did Defendant's management take any corrective action.

**E.  Facts Relating to Plaintiff Bary Marshall's Claims**

106.    Plaintiff Bary Marshall's EEOC/NERC Charge and attached Rider, which include more detailed descriptions of the preceding and following facts, are attached hereto as **Exhibit 5** and incorporated by reference as though fully set forth herein.

107.    From in or around September 2020 through in or around May 2022, Plaintiff Bary Marshall, an African-American male, was employed by Defendant at its facility in Northern Las Vegas.

108.    Plaintiff Bary Marshall is the father of Plaintiffs Bayron, Jaylin, and Kavon Marshall.

109.    During Plaintiff Bary Marshall's employment, he was subjected to a racially hostile work environment by his employer, with no real attempt by his employer to adequately correct the situation, even though Cardinal Paint was well aware of the daily open and notorious racial harassment that Plaintiff Bary Marshall and other African-American workers experienced at work.

110.    For example, in or around January 2021, Mr. Fick used the expression, "them niggers," at work, in the presence of Plaintiff Bary Marshall, to refer to a group of African American employees, including Plaintiffs Bary Marshall, Darnell Coleman, and Brandon Garnett.

111.    In or around March 2021, while weighing the powder paint to get sent off (referred to as a "weight out"), Mr. Fick said to Plaintiff Bary Marshall, "Do you want to stay over here and use your brain, or do you want to go over there and do physical work?"  In saying "over there," Mr. Fick was referring to the area where Plaintiffs Reginald and Darnell Coleman had been working on an extruder machine, so it was clear to Plaintiff Bary Marshall that Mr. Fick was implying that African Americans are dumb, and Caucasian people, like Mr. Fick, are smart.

112.    In or around September 2021, Plaintiff Bary Marshall was present when Mr. Fick made the comment that "the best way to keep your [African American] crew going is to buy them some chicken" and laughed immediately after.  Plaintiff Bary Marshall reported this incident to Plaintiff Reginald Coleman.

113.    Moreover, around the same time (September 2021), when an African American coworker, Plaintiff Roderick Andrews, quit over Mr. Fick's use of racial slurs and the "n" word at work, Mr. Fick said to Plaintiff Bary Marshall, referring to Plaintiff Roderick Andrews, "that nigger don't know how good he had it" at Cardinal Paint.  Plaintiff Bary Marshall again reported this incident to Plaintiff Reginald Coleman.

114.    In addition to the monthly verbal complaints Plaintiff Bary Marshall made to Plaintiff Reginald Coleman regarding Mr. Fick's racist conduct, in or around December 2021, Plaintiff Bary Marshall made a verbal complaint to President Jonny Mitchinson, informing Mr. Mitchinson that Mr. Fick's actions were making employees feel very uncomfortable.  Unfortunately, that conversation was interrupted, and Mr. Mitchinson never followed up with Plaintiff Bary Marshall about his complaint.

115.    In or around February of 2022, while Plaintiff Bary Marshall, his sons, Plaintiffs Bayron and Jaylin Marshall, and other African American coworkers, Plaintiffs Reginald and Darnell Coleman, were having a morning meeting with Mr. Fick, Mr. Fick walked away and said, "You niggers is crazy!"

116.    Plaintiff Bary Marshall was also present when Mr. Fick made anti-Hispanic and anti-Mexican comments, too, including, "I can't stand those motherfucking Mexicans! They need to go back home to Tijuana!"

117.    Bary Marshall was aware of numerous complaints made by various employees about Mr. Fick's racial harassment to HR (verbally), including a complaint by employee Preston Drusendahl

("Mr. Drusendahl"), who was biracial (Asian and African American), prior to March 2022, when Mr. Drusendahl quit because he could no longer tolerate the racial harassment at Cardinal Paint.  Plaintiff Bary Marshall was also aware of complaints submitted by Plaintiffs Darnell Coleman and Roderick Andrews, and he knew that Plaintiff Roderick Andrews quit in or around September 2021 because he could no longer tolerate Mr. Fick's racial harassment.  Plaintiff Brandon Garnett, another African American employee, made a verbal complaint to HR and was subsequently fired.  And, Plaintiff Bary Marshall was aware of complaints submitted by Plaintiffs Brandon Garnett, Reginald Coleman, Darnell Coleman; his sons, Plaintiffs Bayron and Jaylin Marshall; along with Mr. McCree and Mr. Lowrey, on or around July 15, 2022, yet nothing was done in response to any of these complaints to stop Mr. Fick from using the "n" word at work.

118.    In or around May 2022, Plaintiff Bary Marshall quit because he could no longer tolerate the racially hostile work environment at Cardinal Paint.

119.    To Plaintiff Bary Marshall's knowledge, Cardinal Paint has no policies to train employees about racial harassment or retaliation.  Plaintiff Bayron Marshall never received anti-racial harassment training during his employment with Cardinal Paint.

120.    The racial harassment was open and notorious, and occurred out in the open, in front of management, including Plaintiff Reginald Coleman, and Marcella from HR. Despite having observed the racially hostile environment experienced by Plaintiff Bary Marshall and other African-American workers, none of Plaintiff Bary Marshall's supervisors, other than Plaintiff Reginald Coleman, did anything to stop it.  Nor did Defendant's management take any corrective action.

**F.  Facts Relating to Plaintiff Kavon Marshall's Claims**

121.    Plaintiff Kavon Marshall's EEOC/NERC Charge and attached Rider, which include more detailed descriptions of the preceding and following facts, are attached hereto as **Exhibit 6** and incorporated by reference as though fully set forth herein.

122.    From on or around March 14, 2021 through in or around early September of 2022, Plaintiff Kavon Marshall, an African-American male, worked for Defendant at its facility in Northern Las Vegas as a Mill Operator in the Production Department.  Thereafter, from in or around September

2022 through the present, Plaintiff Kavon Marshall has worked as a Mill Operator for Defendant in the Express Department.

123.    Plaintiff Kavon Marshall's supervisors, Eli (last name unknown), who is a Hispanic male, and Mr. Fick and Mr. Ingram, who are both white males, subjected Plaintiff Kavon Marshall and other employees to a racially hostile environment, with no real attempt by his employer to adequately correct the situation, even though Cardinal Paint was well aware of the daily open and notorious racial harassment that Plaintiff Kavon Marshall and other African-American workers experienced at work.

124.    For example, while Plaintiff Kavon Marshall was working in the Production Department under supervisors Eli and Mr. Ingram, even though new uniforms were given to non-African-American employees immediately, Black employees, including Plaintiff Kavon Marshall, had to wait almost one year to get uniforms and were only given pieces of uniforms from former employees or extras that happened to be laying around.

125.    Plaintiff Kavon Marshall and other non-African-American employees were also reprimanded for making coffee, and Mr. Ingram would prohibit them from bringing water bottles to the floor or using the restroom instead of porta potties, even though other employees were permitted to make coffee, bring water bottles onto the floor, and use a normal restroom.

126.    Plaintiff Kavon Marshall also noticed that non-Black employees would be intentionally hired, promoted, and given raises while African American employees were passed over for the same, even if they had been working there longer.

127.    Additionally, supervisor Eli would change Plaintiff Kavon Marshall's schedule several times per month and not tell him about the schedule changes until the last minute.  And Eli would not accommodate Plaintiff Kavon Marshall when he asked for an early release so that he could catch up on sleep because of his varied schedule, even though Eli accommodated a Mexican employee with his schedule so that the employee could go to school.

128.    On or around October 20 or 21, 2022, after Plaintiff Kavon Marshall was transferred to the Express Department without having been provided a reason why that transfer occurred, Plaintiff Kavon Marshall was working on Plaintiff Jaylin Marshall's machine.  Plaintiffs Kavon, Jaylin, and Bayron Marshall, as well as Mr. Fick, were all present.  They were all talking about race cars, and

Plaintiff Kavon Marshall mentioned that he has a Camaro that he had been trying to tune up, but that the engine was not in the car yet.  Mr. Fick said to Plaintiff Kavon Marshall, in front of the others, "No poor or rich monkey would drive a Camaro."  No one said anything, and the employees looked at each other in shock.  Then, Mr. Fick said to Plaintiff Kavon Marshall, "Even poor monkeys don't go that slow."  Plaintiff Kavon Marshall's jaw dropped in shock, as this was his first month in the Express Department.  Plaintiffs Bayron and Jaylin Marshall's jaws also dropped.  Everyone ended up just walking away.

129.    To Plaintiff Kavon Marshall's knowledge, Cardinal Paint does not have a regular policy to train employees about racial harassment or retaliation.  Plaintiff Kavon Marshall does not recall receiving anti-racial harassment training during his employment with Cardinal Paint.

130.    The racial harassment was open and notorious, and occurred out in the open, in front of management, including Eli, Chris Ingram, and Craig Fick. Despite having observed the racially hostile environment experienced by Plaintiff Kavon Marshall and other African-American workers, none of Plaintiff Kavon Marshall's supervisors did anything to stop it. Nor did Defendant's management take any corrective action.

**G. Facts Relating to Plaintiff Thomas Jones' Claims**

131.    Plaintiff Thomas Jones' ("Plaintiff Jones") Declaration, which includes a more detailed description of the preceding and following facts, is attached hereto as **Exhibit 7** and incorporated by reference as though fully set forth herein.

132.    From in or around March 2019 through on or around August 5, 2019, Plaintiff Jones, an African-American male, was employed by Defendant at its facility in Northern Las Vegas.

133.    During Plaintiff Jones' employment, he was subjected to a racially hostile work environment by his employer, with no real attempt by his employer to adequately correct the situation, even though Cardinal Paint was well aware of the daily open and notorious racial harassment that Plaintiff Jones and other African-American workers experienced at work.

134.    For example, on or around July 29 or July 30, 2019, while preparing the mill machine, Plaintiff Jones was approached by Mr. Fick, who said, "What's up, my nigger?"  Plaintiff Jones asked Mr. Fick to stop saying the "n" word, to which Mr. Fick replied, "Shut up, man! I was raised around

black people. I am from Houston. All me and my niggers ride slab." When Plaintiff Jones again asked Mr. Fick to simply stop using the "n" word around him, Mr. Fick stated, "well nobody else complained about it," to which Plaintiff Jones stated that he was complaining about it. Mr. Fick then threw his hands in the air as if he was preparing to fight Plaintiff Jones and stated, "Well, what do you want to do?" Plaintiff Reginald Coleman witnessed the scene, told Plaintiff Jones it was not worth it, and Mr. Fick walked away.

135. On or around July 31, 2019, Plaintiff Jones informed his supervisors, Mr. Fick and Plaintiff Reginald Coleman, both in writing on a whiteboard and verbally, that he would need to take his daughter to an eye doctor appointment on August 2, 2019 (a Friday), and that he needed some time off to do so. Initially, Mr. Fick approved the request. However, Mr. Fick later erased Plaintiff Jones' whiteboard note, and on or around August 5, 2019 (the following Monday), he told Marcella in HR that he did not know where Plaintiff Jones was on August 2, 2019. Plaintiff Jones came into work on August 5, 2019 and showed Mr. Fick and HR the paperwork from the appointment and reminded Mr. Fick that he had approved the time off request. Plaintiff Jones was told to go back to work, but at around 11 a.m. or noon that day, he was called into the office and abruptly terminated.

136. The pretextual reason given for Plaintiff Jones' termination was that he did not show up to work on time, even though Mr. Fick approved his request for time off for that day.

137. Further, Plaintiff Jones was denied unemployment benefits because Mr. Fick listed that he was fired for being a "no call/no show," which was patently false.

138. Throughout his employment at Cardinal Paint, Plaintiff Jones experienced Mr. Fick making racially inappropriate comments to him and his other African American coworkers, including, "Good morning, my nigger;" "you must be joking, my nigger;" and "fuck you, nigger." Plaintiff Jones told Mr. Fick to stop using the "n" word every time he used it, but Mr. Fick would only look at Plaintiff Thomas Jones with an expression signifying that he could not be told what to do because he was the Plaintiffs' supervisor. Additionally, Mr. Fick would play rap music aloud to himself that contained the "n" word, and would overly-emphasize the "n" word as he sang along.

139. On multiple occasions, Plaintiff Jones also heard Mr. Fick refer to Hispanic employees as "wetbacks" and "spics."

140.    During his employment, Plaintiff Jones made two verbal complaints to Marcella in HR – one in May 2019 and the other in July 2019.  In both of those complaints, Plaintiff Jones informed Marcella that Mr. Fick's frequent use of the racial slurs, such as the "n" word, "wetbacks," and "spics" made him extremely uncomfortable.  In response to both complaints, Marcella responded by stating that she would talk to Mr. Fick.  To Plaintiff Jones' knowledge, Marcella never notified Mr. Fick of his complaints or investigated the situation, as Mr. Fick was never reprimanded nor disciplined for his racially hostile comments.  Further, Marcella never followed up with Plaintiff Jones about his complaints.

141.    To Plaintiff Jones' knowledge, Cardinal Paint has no policies to train employees about racial harassment or retaliation.  Plaintiff Jones never received anti-racial harassment training during his employment with Cardinal Paint.

142.    The racial harassment was open and notorious, and occurred out in the open, in front of management, including Plaintiff Reginald Coleman, and Marcella from HR. Despite having observed the racially hostile environment experienced by Plaintiff Jones and other African-American workers, none of Plaintiff Jones' supervisors at Cardinal Paint, except for Plaintiff Reginald Coleman, did anything to stop it.  Nor did Defendant's management take any corrective action.

**H.  Facts Relating to Plaintiff Alberto Avalos, Jr.'s Claims**

143.    Plaintiff Alberto Avalos, Jr.'s ("Plaintiff Avalos") Declaration, which includes a more detailed description of the preceding and following facts, is attached hereto as **Exhibit 8** and incorporated by reference as though fully set forth herein.

144.    From in or around November 2017 until in or around August 2019, Plaintiff Avalos, a Hispanic male, was employed by Defendant at its facility in Northern Las Vegas; however, Plaintiff Avalos had previously worked at Cardinal Paint's El Monte facility since in or around January 2007.

145.    During Plaintiff Avalos' employment, he was subjected to a racially hostile work environment by his employer, with no real attempt by his employer to adequately correct the situation, even though Cardinal Paint was well aware of the daily open and notorious racial harassment that Plaintiff Avalos and his African American co-workers experienced at work.

146.     The racial harassment Plaintiff Avalos experienced was a continuing violation since Plaintiff Avalos started working at Cardinal Paint in 2007.   Beginning in January 2007, John Mitchinson ("Mr. Mitchinson"), who was Plaintiff Avalos's supervisor at the time, and beginning in late December 2017 or early January 2018, his coworker, Mr. Fick, both of whom are white males, subjected Plaintiff Avalos and other employees to a racially hostile work environment.  In other words, the racially hostile work environment that Mr. Fick and others at Cardinal Paint created existed prior to the four years preceding the filing of this complaint.

147.     For example, beginning in January 2007, and on a daily basis thereafter, Mr. Mitchinson would haze Plaintiff Avalos and other new employees by cursing at them and routinely making racially inappropriate remarks and comments.  Mr. Mitchinson also encouraged other employees to participate in the hazing, and those employees would then laugh at Mr. Mitchinson's racist comments. Additionally, on several occasions, whenever Plaintiff Avalos would make a mistake, Mr. Mitchinson referred to him as a "Mongoloid," which caused Plaintiff Avalos to feel shocked and humiliated.

148.     Starting in or around late December 2017 or early January 2018, Mr. Fick also subjected Plaintiff Avalos and other employees to a racially hostile work environment.

149.     In or around January 2018, Plaintiff Avalos heard Mr. Fick, while taking a phone call at work, refer to Mexicans as "wetbacks."  Plaintiff Avalos confronted Mr. Fick and told him, "You can't be talking like that.  I am Hispanic, my parents are Mexican." Mr. Fick responded, "I come from Texas. I don't mean it in a bad way. That is how I was raised.  That is how everyone talks over there."

150.     There were several other occasions during Plaintiff Avalos' employment with Cardinal Paint during which Mr. Fick would routinely use racist slurs in Plaintiff Avalos' presence, including "wetbacks" and the "n" word.  When speaking about then-President Trump's immigration policies while at work, Mr. Fick made comments like, "I don't understand why they [Hispanics] are coming over here.  They should be locked up."  And, when children were being arrested and held in conditions that were reported in the media as being harsh, Mr. Fick stated, "That is what they get for trying to come over here."

151.     On virtually a daily basis from March 2019 to August 2019, Mr. Fick made comments at work that were racially offensive.  In or around March 2019, for example, a co-worker, Plaintiff

Erica Cosey, told Plaintiff Avalos that, while she was cleaning the restroom, she heard Mr. Fick talking with an earpiece in his ear on the phone to someone about Plaintiff Avalos and saying, "that fucking wetback," and that she heard Mr. Fick use the "n" word when talking about African American employee, Plaintiff Thomas Jones.   Mr. Fick continued making these sorts of comments on a regular basis.  Whenever Plaintiff Avalos confronted Mr. Fick about his racist comments, and threatened to complain about him to HR, Mr. Fick responded, "they can't fire me, I'm Johnny's boy," referring to his close friendship with Cardinal Paint President John Mitchinson, who, upon information and belief, is the son of the owner of Cardinal Paint.

152.    Plaintiff Avalos regularly made complaints about Mr. Fick to Mr. Mitchinson, who he had known before from when he worked at the El Monte location, to no avail.  These complaints included that Mr. Fick made racially offensive comments, including the "n" word and referring to Hispanic employees and people as "wetbacks," and that he routinely said sexually offensive comments to and about women.

153.    Marcella in HR was aware of these complaints from conversations with Mr. Mitchinson.  Aware of Mr. Fick's on-going workplace racial harassment, and because of the numerous complaints Plaintiff Avalos submitted to Mr. Mitchinson, Mr. Mitchinson would call Plaintiff Avalos from time to time and ask him, "how is [Mr. Fick] today? Did he do anything today?"

154.    Unfortunately, neither Mr. Mitchinson nor anyone else at Cardinal Paint ever took any action against Mr. Fick.  Most of the time, Mr. Mitchinson would simply tell Plaintiff Avalos to "just ignore [Mr. Fick]," "just don't get into it," and "we need to be a team."  This could be, in part, because Mr. Fick and Mr. Mitchinson shared racially offensive jokes between one another, and, indeed, Plaintiff Avalos had heard Mr. Mitchinson make racially offensive slurs when Mr. Mitchinson was his supervisor in the Lab in California.

155.    In or around August 2019, Plaintiff Avalos also complained to Mr. Mitchinson after he found out that Mr. Fick, who Plaintiff Avalos had trained when he started at Cardinal Paint, received a higher salary than Plaintiff Avalos after getting two raises when Plaintiff Avalos had not received one raise in the over twelve years he worked at Cardinal Paint.  Plaintiff Avalos informed Mr. Mitchinson that he felt he was being discriminated against due to his race, to which Mr. Mitchinson responded, "it

is not like that," and that he would take care of it by giving Plaintiff Avalos a bonus.  Plaintiff Avalos never heard back from Mr. Mitchinson about his complaint, and he never received a bonus or a raise.

156.    Shortly thereafter, Plaintiff Avalos quit because Mr. Mitchinson never followed up regarding his complaints and because Plaintiff Avalos could no longer tolerate the racially hostile work environment at Cardinal Paint.

157.    To Plaintiff Avalos' knowledge, Cardinal Paint does not have any method or procedures to train all employees and managers (in all different departments) about racial and sexual harassment and retaliation.  Plaintiff Avalos does not believe that all employees received anti-racial harassment training from Cardinal Paint.

158.    The racial harassment was open and notorious, and occurred out in the open, in front of management, including Plaintiff's managers/supervisors John Mitchinson, and Marcella from HR. Despite having observed the racially hostile environment experienced by Plaintiff Avalos and other minority workers, Plaintiff Avalos' supervisors did not stop it. Nor did Defendant's management take any corrective action.

**I.    Facts Relating to Plaintiff Roderick Andrew's Claims**

159.    Plaintiff Roderick Andrews ("Plaintiff Andrews") Declaration, which includes a more detailed description of the preceding and following facts, is attached hereto as **Exhibit 9** and incorporated by reference as though fully set forth herein.

160.    From in or around January 2021 until in or around September 2021, Plaintiff Andrews, an African-American male, was employed by Defendant at its facility in Northern Las Vegas.

161.    During Plaintiff Andrew's employment, beginning in or around March 2021, he was subjected to a racially hostile work environment by his employer, with no real attempt by his employer to adequately correct the situation, even though Cardinal Paint was well aware of the daily open and notorious racial harassment that Plaintiff Roderick Andrews and other African-American workers experienced at work.

162.    Starting in or around March 2021, Mr. Fick told Plaintiff Andrews that because he was doing such a good job, Mr. Fick wanted him to come into work thirty minutes to an hour early every day.  Plaintiff Andrews would typically work alone with Mr. Fick early in the morning (5 or 5:30 a.m.),

and he had to leave work later in the day than his coworkers, and it became apparent that Mr. Fick was using Plaintiff Andrews to lighten his own workload.  Plaintiff Andrews' new schedule enabled Mr. Fick to take over ten smoke breaks per day and hardly work on the floor.  Some of those smoke breaks would last over thirty minutes.

163.    In or around April 2021, Plaintiff Andrews realized that he was completing four times the typical workload on the Mill machine compared to the workloads of his coworkers – Plaintiff Andrews was putting out approximately 700-800 pounds of paint per day rather than the typical 200 pounds of paint per day.

164.    After Plaintiff Andrews confronted Mr. Fick about the increased workload, Mr. Fick dismissed the complaint before beginning to nitpick Plaintiff Andrews' work by telling him he was "taking too long" to complete tasks and that he needed to "pick it up," which made no sense considering that Plaintiff Andrews was putting out more work than any of his coworkers.  Mr. Fick would also joke to other employees about how Plaintiff Andrews was working too slowly.  Plaintiff Andrews did not report these incidents to HR because, based on Mr. Fick's repeated racially-motivated comments, Plaintiff Andrews did not think reporting Mr. Fick would have a positive effect.

165.    On several occasions during his employment at Cardinal Paint, Plaintiff Andrews heard Mr. Fick make racially hostile remarks and comments, including comments about Black employees liking chicken, such as "Oh yeah, brothers love their chicken," and comments about Hispanic employees in other departments such as "All they have is Mexicans working over there."

166.    In or around August 2021, Mr. Fick spoke with Plaintiff Andrews about Plaintiff Darnell Coleman, stating, "That dumb motherfucker. He is dumber than a box of rocks. He must have something really big in his pants because I am not sure why his girlfriend stays with him," implying that Plaintiff Darnell Coleman has large genitalia based on the stereotype that African Americans have larger genitalia than men of other races.

167.    In or around September 2021, Plaintiff Andrews quit his job at Cardinal Paint because he felt targeted by Mr. Fick due to his race, and because of Mr. Fick's false remarks that he was working too slowly despite the fact that Mr. Fick made him work more than other Cardinal Paint employees. When Plaintiff Andrews was walking out of the building, he approached Mr. Fick and informed him

COMPLAINT

that he was quitting.  Plaintiff Andrews then realized he forgot some of his belongings, and when he came back into the building, he heard Mr. Fick say in reference to him, "that nigger don't know how good he had it."  Plaintiff Andrews was extremely offended by Mr. Fick referring to him as the "n" word, but because he had just quit, he left the facility without reporting the incident.

168.    Ultimately, Plaintiff Andrews did not make any complaints of racial harassment against Mr. Fick because he did not think his complaints would be investigated by Cardinal Paint.  In or around August 2021, Plaintiff Andrews requested time off for a "vacation" mainly to temporarily escape from Mr. Fick and his racist actions.  Although Plaintiff Andrews followed protocol by submitting his vacation request to Mr. Fick and informing Marcella in HR about it, and although he submitted the request one month in advance and Mr. Fick approved it and informed him that he told HR about it, HR did not receive his request from Mr. Fick until right before the vacation was supposed to start.  Thus, Plaintiff Andrews figured that any complaint he would have made to Cardinal Paint about racial harassment by Mr. Fick would be treated similarly and be summarily dismissed without investigation, making any complaint futile.

169.    To Plaintiff Andrews' knowledge, Cardinal Paint does have a written anti-harassment policy in the employment paperwork given to employees upon hiring.  However, to his knowledge, Cardinal Paint does not utilize any method or procedures to train employees about racial harassment or retaliation.  Plaintiff Andrews never received anti-racial harassment training during his employment with Cardinal Paint.

170.    The racial harassment was open and notorious, and occurred out in the open, in front of management, including Plaintiff's managers/supervisors Plaintiff Reginald Coleman, and Marcella from HR.  Despite having observed the racially hostile environment experienced by Plaintiff Andrews and other African-American workers, none of Plaintiff Andrews's supervisors did not stop it. Nor did Defendant's management take any corrective action.

## J.  Facts Relating to Plaintiff Brandon Garnett's Claims

171.    Plaintiff Brandon Garnett's ("Plaintiff Garnett") EEOC/NERC Charge and attached Rider, which include more detailed descriptions of the preceding and following facts, are attached hereto as **Exhibit 10** and incorporated by reference as though fully set forth herein.

172.   From in or around October 2020 until in or around January 2021 and from in or around October 2021 until on or around January 21, 2022, Plaintiff Garnett, an African-American male, was employed by Defendant at its facility in Northern Las Vegas.

173.   During Plaintiff Garnett's employment, beginning in October 2020, he was subjected to a racially hostile work environment by his employer, with no real attempt by his employer to adequately correct the situation, even though Cardinal Paint was well aware of the daily open and notorious racial harassment that Plaintiff Garnett and other African-American workers experienced at work.

174.   Throughout Plaintiff Garnett's employment at Cardinal Paint, Mr. Fick often took breaks with Plaintiff Garnett, during which he repeatedly made racially inappropriate and offensive jokes to Plaintiff Garnett.

175.   In October 2020, Mr. Fick said to Brandon Garnett, "Yeah, them niggers be lazy," in reference to other African American employees.  Mr. Fick added, "I'm from Texas," "I was in the military," or "me and my friends down in Texas, we don't worry about none of that. I call them niggers all the time and they are cool with it."

176.   In or around January 2021, and in the presence of Plaintiff Garnett, Mr. Fick told Plaintiff Bary Marshall, "nigger, you better go back to work."  On another occasion that month, Mr. Fick used the phrase, "yeah, the niggers" in the presence of Plaintiff Garnett about other African American employees.

177.   During the same month (January 2021), Plaintiff Garnett had stopped working at Cardinal Paint for several months because his supervisor in the Production Department, Eli, refused to provide Plaintiff Garnett with proper PPE, including thicker gloves, which Plaintiff Garnett requested after having an allergic reaction to one of the paint mixes and having his gloves melted by the chemicals in the paint.  Eli also made Plaintiff Garnett stay at work after his shift was over, claiming that Plaintiff Garnett's shift started later than it did (8 a.m. rather than 6 a.m., so Plaintiff Garnett had to stay until 5 p.m. instead of 2:30 p.m.), which made it difficult for Brandon Garnett to pick his child up from school. Eli acted this way toward Plaintiff Garnett despite accommodating similar requests from non-African-American employees.

178.    Plaintiff Garnett complained to John Mitchinson, the president of Cardinal Paint, toward the end of 2020, about Eli's disparate treatment of him, who told Plaintiff Garnett that he would "look into it," but never followed up.  Plaintiff Garnett also complained to Pat (last name unknown) in the HR department about Mr. Fick's incessant use of the "n" word.  Pat stated, "we are going to deal with it and talk to him," but again, nobody followed up with Plaintiff Garnett, and Mr. Fick's racial harassment did not stop.  Because of those interactions, with people who were supposed to help rather than dismiss and enable, Plaintiff Garnett was left with the impression that Cardinal Paint would not properly handle his complaint if he were to make any more.  Plaintiff Garnett was also concerned that he would be fired if he submitted a written complaint, as he saw other employees complain about the racially hostile environment at Cardinal Paint to HR and get subsequently terminated.

179.    On another occasion in or around October 2021, after Plaintiff Garnett had returned to Cardinal Paint and been transferred to the Express Department (under Mr. Fick's purview), Mr. Fick told Plaintiff Garnett the following racist joke: "A black kid and a white kid were walking home from school. The black kid said, 'My dad just got a brand-new car, and it says vavavavavavaaaa.' The white kid said, 'My dad just got a new chain saw and it says, nigger-nigger-nigger.'"

180.    In Plaintiff Garnett's presence, Mr. Fick also often made stereotypical and racist comments about how the Black employees love fried chicken, and he would never buy them any other type of food.

181.    Plaintiff Garnett also heard Mr. Fick refer to two male African American employees at Cardinal Paint as "hoe-ass niggers."

182.    On almost a daily basis in 2021, in the presence of Plaintiff Garnett, Mr. Fick made additional racist comments, such as "them niggers need to get back to work," "you niggers is crazy," and "that nigger is moving slow today."  Each time Plaintiff Garnett heard these racist slurs, he told Mr. Fick, "stop talking to me like that" or "don't talk to me."  In response, Mr. Fick would say, "I'll be here no matter what," and that he "can't get fired."  The more Plaintiff Garnett confronted Mr. Fick about his use of the "n" word, the more Mr. Fick would antagonize him.

183.    At the beginning of 2022, Plaintiff Garnett complained about the racial harassment and was immediately subjected to a retaliatory termination.  Specifically, in or around January 20, 2022,

Plaintiff Garnett complained about Mr. Fick's repeated and ongoing use of the "n" word at work to Mr. Fick himself.  Mr. Fick was upset and told Plaintiff Garnett that if he felt that way he should just go home for the day.  The very next day, Cardinal Paint terminated Brandon Garnett's employment in an egregious act of retaliation.  No reason was provided, with supervisor Eli just saying that Mr. Garnett was "done." Although Plaintiff Reginald Coleman was supposed to be present for the termination meeting, Mr. Fick did not include him in the meeting.  The timing of the discharge – one day after the protected complaints and opposition to Mr. Fick – is very suspicious and strongly suggests retaliation. Moreover, Plaintiff Garnett had no prior write-ups, and thus there was no basis for a termination of his employment.  Indeed, at all relevant times, Plaintiff Garnett performed his work duties admirably. Despite these facts, Cardinal Paint, through Mr. Fick, terminated Plaintiff Garnett's employment in response to his complaints, and then had the audacity to oppose his application for unemployment benefits, all of which demonstrates Cardinal Paint's and Mr. Fick's malice.

184.    To Plaintiff Garnett's knowledge, Cardinal Paint does not have a written policy regarding racial harassment, nor a method or procedure to train employees and managers about racial harassment and retaliation.  Plaintiff Garnett never received anti-racial harassment training during his employment with Cardinal Paint.

185.    The racial harassment was open and notorious, and occurred out in the open, in front of management, including Plaintiff's managers/supervisors Eli, Mitch, and Pat.  Despite having observed the racially hostile environment experienced by Plaintiff Garnett and other African-American workers, Plaintiff Garnett's supervisors did not stop it.  Nor did Defendant's management take any corrective action.

**K.  Facts Relating to Plaintiff Wesley Ledbetter's Claims**

186.    Plaintiff Wesley Ledbetter's ("Plaintiff Ledbetter") EEOC/NERC Charge and attached Rider, which include more detailed descriptions of the preceding and following facts, are attached hereto as **Exhibit 11** and incorporated by reference as though fully set forth herein.

187.    From on or around July 5, 2021 until on or around August 15, 2022, Plaintiff Ledbetter, an African-American male, was employed by Defendant at its facility in Northern Las Vegas.

188.    During Plaintiff Ledbetter's employment, beginning in July 2021, he was subjected to a racially hostile work environment by his employer, with no real attempt by his employer to adequately correct the situation, even though Cardinal Paint was well aware of the daily open and notorious racial harassment that Plaintiff Ledbetter and other African-American workers experienced at work.

189.    On virtually a daily basis at work, Plaintiff Ledbetter's supervisors, Mr. Fick, Mark (last name unknown), and Mr. Ingram, who are all Caucasian males, subjected Plaintiff Ledbetter and other minority workers to a racially hostile work environment.

190.    For example, throughout Plaintiff Ledbetter's employment at Cardinal Paint, African American employees in the production department were not permitted to wear their uniforms outside of the workplace, even though non-African-American employees could do so without consequence. Moreover, Mr. Ingram told Plaintiff Ledbetter and his African American coworkers that they had to leave their uniforms inside their lockers when they were not wearing them at work, and he also would not allow them to go to the breakroom to get water during their shifts, even though Mr. Ingram allowed non-African-American employees to do so.  Similarly, while non-African-American employees were permitted to have water bottles on the floor, Mr. Ingram did not permit the African American employees, including Plaintiff Ledbetter, to do the same, yet he still blamed them for water bottles and trash that were left on the floor by the other non-African-American employees.

191.    Plaintiff Ledbetter also found out that Cardinal Paint stopped his insurance on or about December 5, 2021, even though he was still working at Cardinal Paint, and money was still being deducted out of his paycheck for the insurance for which he no longer had coverage.

192.    Additionally, on virtually a daily basis at work, Plaintiff Ledbetter was called "boy" by supervisors Mark and Mr. Fick.  On one such occasion, in or around January 2022, while Plaintiff Ledbetter was assisting the new manager, Mark, on a machine, Mark said to him, "Boy, I don't want to hear anything you got to say. Anything you got to say, we don't worry about your kind."  It was clear to Plaintiff Ledbetter that by referring to him as "boy" and "your kind," Mark was blatantly disrespecting Plaintiff Ledbetter due to his race.

193.    Whenever Plaintiff Ledbetter would ask Mark about receiving extra pay for training other Cardinal Paint employees, the duty of which was saved for supervisors and department leads

(which Plaintiff Ledbetter was not), Mark would make remarks like, "Boy, you just do what I tell you to do."

194.    Moreover, Plaintiff Ledbetter found out that the Caucasian employees he trained were making significantly more money than him, and when he confronted Mark about it, Mark told him that he could not do anything about it, even though, as a manager, Mark certainly could have done something.

195.    Plaintiff Ledbetter's checks were often short, too, particularly when he worked overtime.  Whenever Plaintiff Ledbetter would inform Mark or Mr. Ingram that his checks were missing overtime pay, they would tell him that he did not work on certain days that he did and made him wait to receive the missing wages.

196.    Mark also followed Plaintiff Ledbetter and other African American workers around the facility, even if they did not work in his department, specifically to harp on them if they made any minor mistake.  Plaintiff Ledbetter never saw Mark do the same with respect to non-African-American employees.

197.    Mr. Fick also routinely used the "n" word in the workplace and during lunch breaks, directed at Plaintiff Ledbetter and other African American employees, as well as the following: "What are these niggers doing here?" and "You [African American] people are getting on my nerves."

198.    Mr. Fick and Mr. Ingram were also racist toward Hispanic employees in the presence of Plaintiff Ledbetter, calling them "wetbacks" and saying, "I'm glad Donald Trump made a wall for y'all," and "Do you have a green card? How did y'all get over here?"

199.    Plaintiff Ledbetter kept a journal in which he made notes and entries about his supervisors' racially harassing comments and slurs.  However, in or around June 2021, Mr. Ingram found out about the journal when he saw Plaintiff Ledbetter using it, waited for Plaintiff Ledbetter to leave it in his locker, and subsequently stole the journal from Plaintiff Ledbetter's locker and never gave it back.

200.    In or around March 2022, Mr. Ingram pulled only African American employees, including Plaintiff Ledbetter, into a meeting and told them that if the managers do not like them, they will not receive raises.

201.    In or around April or May 2022, Plaintiff Ledbetter found out that one of his supervisors, "Nacho" (first and last name unknown), who is Hispanic, quit because Mr. Ingram told him to make sure that all African American employees have bad reviews so that Cardinal Paint would not have to pay them bonuses based on good performance reviews.  More specifically, Nacho had told Plaintiff Ledbetter this information during Plaintiff Ledbetter's annual review in 2021, during which Nacho stated that Cardinal Paint would not increase Plaintiff Ledbetter's pay "because of who [he is]."  To Plaintiff Ledbetter's knowledge, none of the African American employees, including him, ever received raises or good performance reviews.

202.    Plaintiff Ledbetter complained about the racially hostile work environment created by Mr. Fick, Mark, and Mr. Ingram to Marcella in HR; specifically, in or around February 2022, Plaintiff Ledbetter submitted a written racial harassment complaint to Marcella. However, there was no investigation conducted, no discipline imposed, and the supervisors' use of the "n" word and racial slurs against African Americans and Hispanics continued after the complaint was lodged.

203.    Plaintiff Ledbetter also complained to Mr. Fick about Mr. Ingram's racial harassment toward him and other minority workers on or around April 15, 2022, to which Mr. Fick responded, "You are a nobody. They don't care."

204.    In or around April 2022 or May 2022, Plaintiff Ledbetter made a second written complaint to Marcella and HR regarding the same issues he previously reported to them, but again, no investigation was conducted, no discipline was imposed, and the harassment became even worse after each complaint Plaintiff Ledbetter made, to the point that Plaintiff Ledbetter would cry in the bathroom because he felt so disrespected and harassed.

205.    Plaintiff Ledbetter is aware of another written racial harassment complaint lodged with HR by Plaintiff Rafael Brown (who also goes by "Wolf"), which was also ignored and not acted upon by Cardinal Paint.  In fact, Plaintiff Rafael Brown was fired shortly after he complained.

206.    On or around August 15, 2022, Plaintiff Ledbetter quit Cardinal Paint due to the intolerable racially hostile work environment his supervisors subjected him to.

207.    To Plaintiff Ledbetter's knowledge, Cardinal Paint does not have a written policy regarding racial harassment. He never received any anti-racial harassment training during his

employment with Cardinal Paint.

208.    The racial harassment was open and notorious, and occurred out in the open, in front of Cardinal Paint management, including Chris Ingram, and Mark.  Despite having observed the racially hostile environment experienced by Plaintiff Ledbetter and other African-American workers, Plaintiff Ledbetter's supervisors did not stop it. Nor did Defendant's management take any corrective action.

**L.  Facts Relating to Plaintiff Erica Cosey's Claims**

209.    Plaintiff Erica Cosey's ("Plaintiff Cosey") Declaration, which includes a more detailed description of the preceding and following facts, is attached hereto as **Exhibit 12** and incorporated by reference as though fully set forth herein.

210.    From on or around August 24, 2018 until on or around August 24, 2019, Plaintiff Cosey, an African-American female, was employed by Defendant at its facility in Northern Las Vegas.

211.    During Plaintiff Cosey's employment, beginning in December 2018, she was subjected to a racially hostile work environment by her employer, with no real attempt by her employer to adequately correct the situation, even though Cardinal Paint was well aware of the daily open and notorious racial harassment that Plaintiff Cosey and other African-American workers experienced.

212.    Beginning in December 2018, Plaintiff Cosey's direct supervisor, Marcella from HR, and Mr. Fick subjected Plaintiff Cosey to a racially hostile work environment.  For example, Mr. Fick would constantly use the "n" word to describe Plaintiff Cosey.  On one such occasion, when Plaintiff Cosey passed by the employees working in the back of the facility to grab her belongings, Mr. Fick said to her, "What the fuck are you doing back here?"  Plaintiff Cosey replied that she was minding her business, to which Mr. Fick responded, "You don't got no business. Go on, you black nigger bitch." Mr. Fick consistently referred to Plaintiff Cosey as his "nigger bitch."

213.    Immediately after a work Christmas party in December 2018, Mr. Fick called and texted Plaintiff Cosey a few times over the course of a few days and told her, unsolicited, that although he had dated a Black woman, he had never had sex with a Black woman.  He also told her that he "would love to have sex with a black woman."  Whenever Plaintiff Cosey would convey her disinterest to Mr. Fick or politely decline his advances, he would continue referring to her as his "nigger bitch" or his "black nigger bitch."

214.    Mr. Fick also retaliated against Plaintiff Cosey after she repeatedly declined his advances by intentionally making a mess in the restroom, causing Plaintiff Cosey to have to clean it up again after she had already cleaned the restroom immediately beforehand.  And in or around March 2019, Mr. Fick lied to Marcella about Plaintiff Cosey, stating that Plaintiff Cosey got into a verbal altercation with another employee, which was not true.  Without an investigation, however, Marcella suspended Plaintiff Cosey for five days.

215.    Regarding Marcella's mistreatment of Plaintiff Cosey, Marcella would often bring food to work to give to only the Hispanic employees but not the African American employees.  If there were any leftovers, only then would Marcella allow the African American employees to take some.

216.    Additionally, whenever the Hispanic employees went over their allotted lunch times or were late to work, they suffered no consequences, but if Plaintiff Cosey would ever make a minor mistake, Marcella would threaten her with termination.  Marcella also micromanaged Plaintiff Cosey and assigned her tasks outside of the scope of her job, which Marcella was not doing to other non-African-American employees.  Plaintiff Cosey also noticed that when Marcella's assistant, Loretta (last name unknown), who is also African American, and another office worker, Katrina (last name unknown), would attempt to inform the African American employees about their rights in the workplace, which Marcella never informed them of, Marcella would get upset with Loretta and Katrina.

217.    During her employment at Cardinal Paint, Plaintiff Cosey made at least eight written complaints against Marcella and at least five written complaints, as well as some verbal complaints, against Mr. Fick.  Most of these complaints were made in 2019, and a few were made in 2018.

218.    In Plaintiff Cosey's complaints against Mr. Fick, Plaintiff Cosey informed Marcella and Pat in HR that Mr. Fick was lying about not intentionally creating messes in the bathroom for Plaintiff Cosey to clean up due to her declinations of his sexually and racially inappropriate advances, and she even provided pictures of the messes.  Marcella would then instruct Plaintiff Cosey to throw the pictures away, stating that she "has a copy."  But Plaintiff Cosey never heard back from Marcella, Pat, or anyone else at Cardinal Paint regarding her complaints against Mr. Fick.

219.    The same thing happened in regards to the complaints Plaintiff Cosey made against Marcella, some of which she made in or around July 2019 or August 2019.  None of Plaintiff Cosey's

1  complaints were ever investigated, no discipline was ever imposed, and the racial harassment by Mr.

2  Fick and Marcella continued.  Moreover, after Plaintiff Cosey made her complaints about Marcella,

3  and Marcella would find out about them, Marcella would retaliate by making Plaintiff Cosey complete

4  even more work that was not in her job description.

5       220.    On or around August 24, 2019, after Plaintiff Cosey had made her complaints about Mr.

6  Fick and Marcella, and right before Plaintiff Cosey was supposed to receive a raise, Marcella

7  terminated Plaintiff Cosey despite numerous positive comments from coworkers, Pat, Daniel

8  Mitchinson, and John Mitchinson, who all praised Plaintiff Cosey for doing a great job at keeping the

9  facility clean.  In fact, Daniel and John Mitchinson even gave Plaintiff Cosey a bonus one year because

10  they said that she "did more than the average custodian would do."

11       221.    To Plaintiff Cosey's knowledge, Cardinal Paint does have a written anti-harassment

12  policy in the employee handbook given to employees upon hiring.  However, to her knowledge,

13  Cardinal Paint does not have a method or procedure for training employees and managers about racial

14  harassment and retaliation.  Plaintiff Cosey never received any formal anti-racial harassment training

15  during her employment at Cardinal Paint.

16       222.    The racial harassment was open and notorious, and occurred out in the open, in front of

17  management.  Despite having observed the racially hostile environment experienced by Plaintiff Cosey

18  and other African-American workers, Plaintiff Cosey's supervisors did not stop it.  Nor did Defendant's

19  management take corrective action.

20  **M. Facts Relating to Plaintiff Rafael Brown's Claims**

21       223.    Plaintiff Rafael Brown's ("Plaintiff Brown") EEOC/NERC Charge and attached Rider,

22  which include more detailed descriptions of the preceding and following facts, are attached hereto as

23  **Exhibit 13** and incorporated by reference as though fully set forth herein.

24       224.    From in or around April 2021 until in or around April 2022, Plaintiff Brown, an African-

25  American male, was employed by Defendant at its facility in Northern Las Vegas.

26       225.    During Plaintiff Brown's employment, he was subjected to a racially hostile work

27  environment by his employer, with no real attempt by his employer to adequately correct the situation,

28

even though Cardinal Paint was well aware of the daily open and notorious racial harassment that Plaintiff Brown and other African-American workers experienced at work.

226.   Beginning in August 2021, Plaintiff Brown's supervisors, Mr. Fick, Nacho, Elio (last name unknown), Mark, and Mr. Ingram subjected him and other employees to a racially hostile work environment and a pattern or practice of racial harassment.

227.   In or around August 2021, Mr. Ingram began firing many of the African American employees at Cardinal Paint, while hiring mostly Caucasian supervisors, which changed the atmosphere in the workplace.  For example, Plaintiff Brown would frequently train new employees, who were Caucasian, only to find out that within a couple of weeks, those employees would be promoted and then promoted again within a month or so, when they would receive higher rates of pay than Plaintiff Brown.  Conversely, Plaintiff Brown worked as a Mill Operator for five to six months before he was promoted to Extruder Operator.

228.   In or around March 2022, Plaintiff Brown was demoted from Extruder Operator back to Mill Operator for "unsatisfactory performance" despite Cardinal Paint keeping him at the same rate of pay and continuing to instruct him to train new employees.  Plaintiff Brown also found out that the same thing happened to Plaintiff Ledbetter – he trained a Caucasian employee, who soon after surpassed him in pay and position.  That Caucasian employee was given Plaintiff Brown's Extruder Operator role after he was demoted, despite her lack of experience.

229.   Throughout his employment at Cardinal Paint, Plaintiff Brown noticed that only Caucasian and Hispanic employees were allowed to wear their uniforms to and from the workplace, to grab water from the breakroom during shifts, to bring water bottles from the break room onto the floor, and to speak with other employees during shifts.  Mr. Ingram also instructed Plaintiff Brown and other African American employees to keep their uniforms inside of their lockers when they were not wearing them at work, which he did not, to Plaintiff Brown's knowledge, require of the Caucasian and Hispanic employees.  Plaintiff Brown's managers would also blame the African American employees on any water bottles that were left on the floor, even though they were not permitted to bring water bottles out on the floor.  Additionally, if the African American employees spoke to each other, even momentarily, they would be issued write-ups, yelled at to separate, or forced to separate by being placed at different

machines.  This happened on several occasions to Plaintiff Brown and his African American coworker, Troy Hall ("Mr. Hall").

230.   Plaintiff Brown was issued several bogus and pretextual write-ups.  On one such occasion, Plaintiff Brown inadvertently twisted his ankle at work, but because the injury was not bad at first, he simply went home to mitigate and treat his ankle.  When his ankle started swelling and getting worse, Plaintiff Brown reported it to his supervisors.  But even though he reported the injury the same day it occurred, Plaintiff Brown's supervisors, Eli and Elio, issued Plaintiff Brown a write-up because, they claimed, he did not immediately report the injury.

231.   Supervisor Elio would also taunt and make a joke out of Plaintiff Brown and other African American employees by telling them that they were doing a good job, saying "just kidding," and then immediately issuing them write-ups.  However, Elio did not issue write-ups to Caucasian or Hispanic employees when they would make mistakes, like mixing ingredients incorrectly and causing the paint to harden, and he would often blame those mistakes on the African American employees, including Mr. Hall, and issue them write-ups instead.

232.   Once per week during Plaintiff Brown's employment, supervisor Nacho would purposefully mess with the ingredients in the powder code and then blame Mr. Hall and Plaintiff Brown for the incorrectly mixed paint.  He would also blame Plaintiff Brown, Mr. Hall, Plaintiff Ledbetter, and another African American employee, Staffan Williams, for mistakes that occurred during the night shift even though all of those employees only worked the day shift.  However, when a Hispanic employee, Miguel (last name unknown), would not even show up to work, Nacho did nothing to him. Nacho also frequently told Plaintiff Brown and Mr. Hall, "you people is lazy," referring to the fact that both Plaintiff Brown and Mr. Hall are African American.

233.   On multiple occasions, Plaintiff Brown also heard supervisor Mark refer to Plaintiff Ledbetter as "boy" due to Plaintiff Ledbetter's race.

234.   In or around March 2022, Mr. Ingram pulled aside only African American employees for a meeting, and when Plaintiff Brown expressed that he felt he was being targeted by Mark, Mr. Ingram responded, "If your supervisor doesn't like you, there is nothing you can do. I am going to side with the supervisor."

235.    Mr. Ingram also (on several occasions) told Plaintiffs Brown and Ledbetter and Mr. Hall that the Hispanic employees work harder than them, and that they were not working hard enough, even though Plaintiff Brown consistently met his work quota throughout his employment.

236.    Mr. Fick also subjected Plaintiff Brown to a racially hostile work environment.  Mr. Fick would turn off the African American employees' machines and hide parts from them, including hiding parts from Plaintiff Darnell Coleman at least once per month so that Plaintiff Darnell Coleman would be unable to do his job.  Mr. Fick would also frequently say, "we don't need to build a wall and shit," implying that employees of color, including Hispanic employees, are so lazy that they would not come over and take jobs from American citizens absent a wall on the US/Mexico border.

237.    Beginning in or around August 2021, Plaintiff Brown made several verbal complaints of racial harassment to Eli, Mark, and Mr. Ingram regarding the disparate treatment supervisors subjected him and other African American employees to.  Every time, like an old boys' club, the supervisors would tell Plaintiff Brown that they were not going to believe him and would instead side with each other.  In other words, Plaintiff Brown's supervisors made sure that Plaintiff Brown's complaints would be useless and dismissed.

238.    In or around April 2022, Plaintiff Brown made a written complaint to Marcella in HR regarding the racially hostile work environment created by supervisors Nacho, Mark, Mr. Ingram, and Mr. Fick.  He explained in his complaint that he believed his supervisors were trying to get him fired intentionally by messing with the equipment he and other African American employees used, purposefully giving them incorrect instructions, and issuing write-ups to them based on other workers' mistakes or minor mistakes for which non-African-American employees were not written up for. Marcella stated that she would follow up with management about Plaintiff Brown's written complaint, but no one ever followed up with him.

239.    Instead, Plaintiff Brown was terminated the same day he made his written complaint and issued a third write-up for something that allegedly happened a day prior, even though write-ups were supposed to be issued on the day that an incident happens.  Plaintiff Brown was told that this third write-up was issued for "not following rules and regulations" when he did not stay to clean up the machines the day before, even though that day he was told by his lead to "go home already."

240.   During the termination meeting, Plaintiff Brown's supervisors stated that he was being terminated for unsatisfactory performance, but when Plaintiff Brown asked how his performance could be unsatisfactory if he was the employee training many of the new employees, his supervisors did not respond and only asked him to sign termination paperwork, which Plaintiff Brown refused to do.  When Plaintiff Brown informed Marcella about the termination, all she said was "aww" and brushed it off while the other supervisors were standing in the door watching Plaintiff Brown.  Approximately five minutes after Plaintiff Brown left, he received a phone call from Mr. Hall informing him that Mr. Hall was also fired on the same day.

241.   The same morning Plaintiff Brown was terminated, he spoke with Daniel Mitchinson and informed him that he felt he was being wrongfully terminated due to his race.  Daniel Mitchinson told Plaintiff Brown that he would look into it and that either he or Marcella would contact Plaintiff Brown.  Daniel Mitchinson also told Plaintiff Brown that Cardinal Paint had received several other complaints from employees regarding the hostile work environment.  A day or two later, after not hearing back from Daniel Mitchinson or Marcella, Plaintiff Brown called Daniel Mitchinson again, but he received the same response.  Ultimately, he never heard anything back about his complaints – to Plaintiff Brown's knowledge, no investigations were conducted, no discipline was imposed against his supervisors, and Cardinal Paint ultimately did nothing to address or remedy the racially hostile work environment it caused and fostered.

242.   To Plaintiff Brown's knowledge, Cardinal Paint does not have a written policy regarding racial harassment, and he never received any anti-racial harassment training during his employment with Cardinal Paint.

243.   The racial harassment was open and notorious, and occurred out in the open, in front of management, including Plaintiff's managers/supervisors Eli, Elio, Nacho, and Mr. Ingram.  Despite having observed the racially hostile environment experienced by Plaintiff Brown and other African-American workers, Plaintiff Brown's supervisors did not stop it. Nor did Defendant's management take any corrective action.

/ / /

/ / /

## VI.     <u>FIRST CAUSE OF ACTION</u>

### RACIAL HARASSMENT IN VIOLATION OF SECTION 42 U.S.C. § 1981

(All Plaintiffs Against Defendant)

244.     Plaintiffs hereby incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

245.     Section 1981 provides that all persons shall have the same right "to make and enforce contracts."   The version of this statute enacted in 1874 did not apply to conduct, such as racial harassment, that occurred after the formation of a contract and did not interfere with the right to enforce established contract rights through legal process. *Patterson v. McLean Credit Union*, 491 U.S. 164, 175-85, 109 S.Ct. 2363 (1989).  In 1991, however, Congress amended the statute to broaden its scope by defining the phrase "make and enforce contracts" to include the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

246.     Since 1991, the Ninth Circuit has recognized that Section 1981 prohibits racial harassment that affects the performance of a contract or the enjoyment of the benefits, privileges, terms, and conditions of a contractual relationship.  It is now also well-settled that an "at will" employment relationship also constitutes a "contract" for purposes of Section 1981.  Racial harassment and other discrimination in an employment relationship occurring after contract formation is thus actionable under Section 1981. *Swinton v Potomac Corp.,* 270 F.3d 794, 806-807 (9th Cir. 2001).

247.     In this case, all Plaintiffs were at-will employees of Defendant, as set forth above, during the time periods specified above.

248.     The elements of racial harassment claims under Section 1981 are identical to the elements of those same claims under Title VII. *Swinton*, 270 F.3d at 807.[1] An employer is liable for a hostile environment claim under Section 1981 where the employee proves (1) that he was subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and

---

[1] There is, however, one very significant difference between Section 1981 and Title VII. In contrast to Title VII, "Congress has not seen fit to impose recovery caps in cases under § 1981, although it has had ample opportunity to do so since the 1991 amendments to Title VII." *Swinton*, 270 F.3d at 820.

1   create an abusive working environment. *Id.*

2       249.   The Ninth Circuit Court of Appeals has unequivocally stated that the use of the word

3   "nigger" is the most highly offensive and demeaning racial epithet, evoking a history of racial violence,

4   brutality, and subordination. *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004).  It

5   has even been called "the most offensive and inflammatory racial slur in English." *Swinton v. Potomac*

6   *Corp.,* 270 F.3d 794, 817 (9th Cir.2001) (ellipsis in original) (quotation marks omitted); *see also Daso*

7   *v. The Grafton School, Inc.,* 181 F.Supp.2d 485, 493 (D.Md.2002) ("The word 'nigger' is more than

8   [a]' mere offensive utterance'.... No word in the English language is as odious or loaded with as terrible

9   a history."). The same is true of the words, "wetbacks", "Spics" and "chicos." *See EEOC v. Ceisel*

10   *Masonry, Inc*., 594 D.Supp.2d 1018, *11 (N.D. Ill. 2009).

11       250.   Perhaps no single act can more quickly alter the conditions of employment and create

12   an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a

13   supervisor in the presence of his subordinates." *Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d

14   668, 675 (7th Cir.1993) (citations and internal quotation marks omitted).

15       251.   All Plaintiffs in this action (except Plaintiff Alberto Avalos, Jr., who is Hispanic) are

16   African-Americans.  Accordingly, based on their race, all Plaintiffs in this action are members of a

17   protected class.  And, as described in detail above, Defendant repeatedly subjected all Plaintiffs to

18   unwelcome racial harassment that negatively affected the terms and conditions of their employment by

19   making the working environment hostile, abusive, and discriminatory.

20       252.   By virtue of the fact that Defendant's management knew of and allowed the workers on

21   the site to continue to subject Plaintiffs to conduct of a racially harassing nature, that the conduct was

22   unwelcome as evidenced by the fact that Plaintiffs were offended and complained about it repeatedly,

23   and that the conduct created a work environment severe and pervasive enough to alter the conditions

24   of Plaintiffs' employment, Defendant knew or should have known of the racial harassment, and

25   Defendant failed to take prompt and effective remedial action to stop it.  Finally, Plaintiffs subjectively

26   perceived the racial harassment to be severe, pervasive and offensive, and their perception was

27   objectively reasonable.

28

253.    As a direct and proximate result of Defendant's violations of Section 1981, Plaintiffs have suffered emotional distress, anguish, humiliation, and emotional pain and suffering.  Therefore, Plaintiffs are entitled to recover compensatory damages for past and future non-pecuniary losses, emotional distress, anguish, pain, suffering, humiliation, and loss of enjoyment of life.

254.    Defendant, through its supervisors' and management's participation and knowledge, intentionally engaged in the above-described discriminatory practices with malice and/or reckless indifference to the federally protected rights of Plaintiffs. Defendant's supervisors intentionally, maliciously, and/or recklessly disregarded numerous objections and verbal complaints from Plaintiffs and others about the racial harassment and the racially hostile work environment.  Accordingly, Plaintiffs are entitled to an award of punitive damages against Defendant.  Plaintiffs seek relief as set forth below.

## SECOND CAUSE OF ACTION

### RETALIATORY TERMINATION IN VIOLATION OF 42 U.SC. § 1981

(Plaintiffs Brandon Garnett, Erica Cosey, and Rafael Brown against Defendant)

255.    Plaintiffs hereby incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

256.    Under Section 1981, a plaintiff must prove three elements in order to establish a claim for retaliation: (1) that the employee engaged in statutorily protected activity against the employee; (2) that the employer took adverse action against the employee; and (3) the establishment of a causal connection between (1) and (2).

257.    Plaintiffs Brandon Garnett, Erica Cosey, and Rafael Brown engaged in statutorily protected activities by lodging formal complaints concerning the racially hostile work environment.

258.    Plaintiff Brandon Garnett made numerous racial harassment complaints to Craig Fick, Eli (last name unknown), Mitch (last name unknown), and Pat (last name unknown) in or around November 2020 and again on or around January 20, 2022, but Cardinal Paint did nothing to investigate the racist harassment or stop it.

259.    On or about January 21, 2022, just one day after Plaintiff Garnett complained of the racist conduct on site directly to Mr. Fick, Defendant terminated his employment without having

allowed Plaintiff Reginald Coleman, who was supposed to be present for the meeting, in the room. Any reason now given by Cardinal Paint for terminating Plaintiff Garnett would be pretextual because Plaintiff Garnett had complained about the incessant racial harassment by Mr. Fick only a day prior to being terminated, and there were no non-discriminatory reasons given for his termination. Additionally, the fact that Cardinal Paint caused Plaintiff Garnett's application for unemployment benefits to be denied shows that Cardinal Paint intended to maliciously harm Plaintiff Garnett even after his termination due to his race.

260.    Plaintiff Erica Cosey made numerous racial harassment complaints to Marcella, Pat, and Daniel Mitchinson throughout 2018 and 2019, including complaints made in or around July or August of 2019 (right before her termination), but Cardinal Paint did nothing to investigate the racist harassment or stop it.

261.    Shortly after Plaintiff Cosey complained of the racist conduct on site by Mr. Fick and Marcella, Marcella claimed that Plaintiff Cosey did not clean properly, even though Mr. Fick was the one intentionally making the restrooms messy after Plaintiff Cosey would have already cleaned them. Defendant terminated Plaintiff Cosey's employment, right before she was supposed to receive a raise, for "unsatisfactory cleaning."  This reason was pretextual because Plaintiff Cosey was constantly recognized by others (including management) for the quality of her work and even received a bonus for it, and Pat in HR even told Plaintiff Cosey that he "didn't want to do this," referring to not wanting to terminate Plaintiff Cosey after Marcella made Pat conduct the meeting.

262.    Plaintiff Rafael Brown made numerous racial harassment complaints to Eli, Mark, Mr. Ingram, and Marcella starting in or around the end of August 2021 through in or around April 2022, but Cardinal Paint did nothing to investigate the racist harassment or stop it.

263.    On the same day that Plaintiff Brown made a written complaint (in April 2022) regarding the racist conduct on site, Defendant terminated his employment for "unsatisfactory performance."  This reason was pretextual because the write-ups that led to termination were themselves pretextual and made based on Plaintiff Brown's race.  The third write-up (regarding Plaintiff Brown not helping to clean the machines the previous day), in particular, was baseless and made specifically to terminate Plaintiff Brown, as Plaintiff Brown was told by his supervisor to "go

home already," and Plaintiff Brown did as he was told.  Additionally, Defendant could not even explain how Plaintiff Brown's performance was unsatisfactory, and his supervisors ignored Plaintiff Brown when he asked him how his performance could be unsatisfactory if they were still asking him to train new employees.

264.    As outlined above, shortly after Plaintiffs Garnett, Cosey, and Brown made complaints of racial harassment against Mr. Fick and other Cardinal Paint supervisors, they were terminated for no valid reasons.  The proximity of the terminations within a short amount of time after the complaints about racial harassment were lodged, makes clear that Defendant retaliated against Plaintiffs Garnett, Cosey, and Brown as a result of their protected activities.

265.    By terminating or taking retaliatory action against these Plaintiffs within close proximity of their protected activities, Defendant took illegal adverse actions against them because of their protected activities. Defendant's actions therefore constitute illegal retaliation in violation of 42 U.S.C § 1981, as interpreted by the U.S. Supreme Court in *CBO CS West, Inc. vs. Humphries*, 128 S.Ct 1951 (2008).

266.    As a direct and proximate result of Defendant's violations of the anti-retaliation component implicit within 42 U.S.C § 1981, these three Plaintiffs have suffered lost back pay, front pay, and interest, as well as emotional distress, mental suffering, inconvenience, and mental anguish. Therefore, these Plaintiffs are entitled to recover front pay, back pay, interest, as well as compensatory damages for past and future non-pecuniary losses, emotional pain, suffering, inconvenience, and emotional anguish to the maximum extent and amount by law.  Plaintiffs seek relief as outlined below.

## VII.    DEMAND FOR JURY TRIAL

267.    Plaintiffs hereby demand trial by jury for all of their claims against Defendant.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs requests the following relief:

1.      **On the First Cause of Action:**

a.      Defendant be found liable for creating and fostering a racially hostile work environment in which Plaintiffs were forced to work during their at-will employment contract with Defendant in violation of 42 U.S.C. section 1981;

b.      Defendant compensates Plaintiffs for all actual damages caused by its violations of Section 1981;

c.      An award of $5,500,000 dollars in compensatory damages against Defendant and in favor of Plaintiffs for Plaintiffs' past, present, and future non-pecuniary losses, including emotional distress, pain and suffering, mental anguish, and humiliation caused by Defendant's racially hostile work environment;

d.      An award of reasonable attorneys' fees, pursuant to 42 U.S.C. section 1988(b), for all work performed by counsel for Plaintiffs on behalf of Plaintiffs;

f.      An award of all costs and expert fees, pursuant to 42 U.S.C. section 1988(b) and (c), incurred by Plaintiffs' counsel in litigating this matter; and

g.      An award of punitive damages in an amount to be determined by a jury against Defendant and in favor of Plaintiffs based on Defendant's malicious or reckless disregard of Plaintiff's federally-protected right to work under an at-will employment contract in an environment free from racial harassment; and

2.      **On the Second Cause of Action:**

a.      Defendant be found liable for terminating Plaintiffs Brandon Garnett, Erica Cosey, and Rafael Brown in retaliation for their complaints concerning the racially hostile workplace propagated by Defendant in violation of Section 1981;

b.      Defendant compensates these Plaintiffs for all actual damages caused by its violations of Section 1981;

c.      An award of $500,000 dollars to each Plaintiff with claims of retaliation in compensatory damages against Defendant and in favor of these Plaintiffs for these Plaintiffs' past, present, and future non-pecuniary losses, including emotional distress, pain and suffering, mental anguish, and humiliation caused by Defendant's retaliatory actions in violation of Section 1981;

d.      An award of reasonable attorneys' fees for all work performed by counsel for these Plaintiffs on behalf of these Plaintiffs;

e.      An award of all costs and expert fees incurred by Plaintiffs' counsel in litigating this matter; and

f.  An award of punitive damages against Defendant and in favor of Plaintiffs in an amount to be determined by a jury on Defendant's malicious or reckless disregard of Plaintiffs' federally-protected right to engage in a protected activity free from retaliation.

3.  And all other relief which the Court deems just and proper.

DATED this 6th day of January, 2023.

Respectfully submitted,

By:  /s/ Joseph A. Gutierrez
JASON R. MAIER, ESQ.
Nevada Bar No. 8557
JOSEPH A. GUTIERREZ, ESQ.
Nevada Bar No. 9046
DANIELLE J. BARRAZA, ESQ.
Nevada Bar No. 13822
**MAIER GUTIERREZ & ASSOCIATES**
8816 Spanish Ridge Avenue
Las Vegas, Nevada 89148

By:  /s/ Craig J. Ackermann
CRAIG J. ACKERMANN, ESQ.
California Bar No. 229832
**ACKERMANN & TILAJEF, P.C.**
1180 South Beverly Drive, Suite 610
Los Angeles, California 90035
*Attorneys for Plaintiffs*

**Index of Exhibits**

| Exhibit No. | Description | Number of Pages |
|---|---|---|
| Exhibit 1 | Reginald Coleman's EEOC Charge | 14 |
| Exhibit 2 | Darnell Coleman's EEOC Charge | 8 |
| Exhibit 3 | Bayron Marshall's EEOC Charge | 6 |
| Exhibit 4 | Jaylin Marshall's EEOC Charge | 10 |
| Exhibit 5 | Bary Marshall's EEOC Charge | 6 |
| Exhibit 6 | Kavon Marshall's EEOC Charge | 4 |
| Exhibit 7 | Thomas Jones Declaration | 3 |
| Exhibit 8 | Alberto Avalos Declaration | 6 |
| Exhibit 9 | Roderick Andrews Declaration | 4 |
| Exhibit 10 | Brandon Garnett's EEOC Charge | 6 |
| Exhibit 11 | Wesley Ledbetter's EEOC Charge | 5 |
| Exhibit 12 | Erica Cosey Declaration | 5 |
| Exhibit 13 | Rafael Brown's EEOC Charge | 6 |